508 F.2d 1039
 9 Fair Empl.Prac.Cas. 174, 9 Empl. Prac. Dec. P 9886
ROSSETTI CONTRACTING COMPANY, INC., Plaintiff-Appellee,
v.
Peter J. BRENNAN, Secretary of Labor, and Environmental
Protection Agency, Defedants-Appellants, and John McElwain,
President, Board of Trustees, HinsdaleSanitary District,
DuPage County, Defendant-Appellant, and Hinsdale
SanitaryDistrict,DuPage County, Defendant-Appellant, and
Loitz Brothers Construction Co., Inc.,Intervening Defendant-Appellant.
 Nos. 74-1850, 74-1851 and 74-1853.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 11, 1974.
Decided Dec. 30, 1974, Opinion Jan. 9, 1975.
 
 James R. Thompson, U.S. Atty., Gary L. Strakman and Martin B. Lowery, Asst. U.S. Attys., Chicago, Ill., Louis R. Main, Hinsdale, Ill., Peter B. Carey, Chicago, Ill., for defendants-appellants.
 James E. O'Halloran, Jr., Chicago, Ill., for plaintiff-appellee.
 Before FAIRCHILD, PELL and SPRECHER, Circuit Judges.
 FAIRCHILD, Circuit Judge.
 
 
 1
 This appeal presents the issue of whether a bidder on a federally assisted construction contract who fails to submit with his bid the appropriate commitment required by the 'Chicago Plan' for minority hiring,[1] may amend his bid submission subsequent to the opening of the bid so as to quality as a responsive bidder.
 
 
 2
 On May 10, 1974, appellant Hinsdale Sanitary District, an Illinois Municipal Corporation of Cook and DuPage counties, solicited bids for the construction of an intercepter sewer, a phase of a project which was to be constructed with the assistance of partial funding from the United States Environmental Protection Agency (EPA). The invitation for bids issued by the Sanitary District fully incorporated the provisions of the Chicago Plan, a regulation promulgated by the Secretary of Labor which requires, as a prerequisite to eligibility for a contract award in certain federally involved construction projects in the Chicago, Illinois SMSA,[2] conpletion and submission prior to bid opening of an 'Appendix A' or its equivalent, indication goals for minority manpower utilization in designated trades on all the bidder's work during the term of performance of the contract, within ranges prescribed by the Secretary of Labor.[3]
 
 
 3
 Bids were opened on June 7, 1974 and the apparent low bidder was appellee Rossetti Construction Company, with a bid of $1,988,908.00. The Sanitary District granted Rossetti tentative award of the contract pending approval of the bid's compliance with federal contract regulations, including those imposed by the Chicago Plan, and submitted the bid to the EPA Contract Compliance Office for consideration. On June 28, 1974, the director of the Office for Civil Rights and Urban Affairs of EPA notified the Sanitary District that, due to failure to comply with the Chicago Plan's requirements, Rossetti's bid was considered to be unresponsive. Specifically, he found that by placing brackets around all of the trades designated on Appendix A, Rossetti had failed to indicate which specific trades it intended to utilize on the project; and, by placing the figure of 10% Opposite the bracketed trades, it had failed to designate acceptable manpower goals within the prescribed ranges required by the Plan.[4]
 
 
 4
 Rossetti protested the rejection and sought an opportunity to appear before that agency and present evidence concerning its bid. On July 2, 1974, a meeting between Rossetti and EPA compliance officials was held during which Rossetti tendered an amended Appendix A, correcting the defects in its prior submission.[5] In support of this amendment, a written statement was provided setting forth the circumstances explaining the origianl Appendix A[6] and providing documentation tending to establish a past history of active participation in minority employment programs and actual compliance with the appropriate minority hiring goals for operating engineers set forth in Appendix A for the year 1974.[7]
 
 
 5
 The matter was taken under consideration by the EPA and, on July 10, 1974, after consultation with Department of Labor officials, possessing primary authority for interpretation of the Plan, Rossetti was informed that the Chicago Plan provided no authority or discretion to permit amendment of a nonresponsive Appendix A subsequent to bid opening. Accordingly, Rossetti's bid was found to be unresponsive and the Sanitary District prepared to award the contract to the project's second low bidder, intervening defendant appellant Loitz Brothers Construction Company.[8]
 
 
 6
 On July 11, 1974, Rossetti Filed an action in the United States District Court for the Northern District of Illinois seeking declaratory and injunctive relief. The parties agreed to maintain the status quo pending judicial resolution. After a full hearing, the district court concluded as a matter of law that the error in Rossetti's Appendix A was a good faith inadvertent misstatement which, since Rossetti was in fact in current compliance with the Chicago Plan's utilization goals and since the error did not affect price, quality or quantity of goods or services provided, was minor and could be corrected or waived without violence to the Chicago Plan's purpose or intent. The court rejected the Department of Labor's position that no federal agency had the power to permit such post-bid-opening amendment of Appendix A as being without basis in law and deemed the position clearly contradicted by repeated exercise of discretion in the past. Accordingly, the court issued a decree compelling the Department of Labor to accept Rossetti's amendment and to find its bid responsive, and enjoining the Sanitary District from granting the contract award to any party other than Rossetti. All defendants appeal.
 
 
 7
 Rossetti seeks judicial review of the Department of Labor's determination that the Chicago Plan precludes post-bid-opening amendment of its unresponsive Appendix A. While the Administrative Procedure Act, 5 U.S.C.A. 702, provides a basis for such consideration, Scanwell Laboratories, Inc. v. Shafer, 137 U.S.App.D.C. 371, 424 F.2d 859, 872 (1970), the applicable standards of review are narrowly circumscribed. It is well established that great deference is due to the interpretation given an administrative regulation by the federal agency entrusted with its promulgation and interpretation. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Contractors Ass'n of Eastern Pa. v. Secretary of Labor, 442 F.2d 159, 175 (3rd Cir. 1971), cert denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95. Moreover, when the administrative determination at issue concerns procurement of bid disputes, 'if the court finds a reasonable basis for the agency's (decision), the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' Steinthal v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289, 1301 (1971).
 
 
 8
 For purposes of decision, we assume the correctness of the district court's findings of fact concering the circumstances underlying the preparation of the defective Appendix A,[9] the good faith of Rossetti's officers in the matter,[10] and it actual compliance with the Chicago Plan's minority employment utilization goals at the date of the submission of its bid. Our review of the applicable authority and of the record persuades us, however, that even assuming the facts found, the judgment appealed from is erroneous.
 
 
 9
 The district court concluded that the Plan must be interpreted so as to permit the Department of Labor to exercise discretion sufficient to approve the filing, after opening of a bid, of an amended Appendix A, committing the bidder to minority employment goals within the prescribed range for the trade actually involved, where (1) the inadequate commitment origianlly submitted was an inadvertent error made in good faith and (2) the bidder's current hiring of minority employees is in fact within the prescribed range. The court considered that in the light of the purpose of the Plan, to promote minority hiring in skilled construction trades, no useful purpose would be served by disqualifying a contractor for inadvertent error, when it has proved that its minority hiring practices comply with the goals of the Plan. The court relied on the proposition that a regulation should be interpreted in such a manner as to promote its purpose. The court deemed the error under the circumstances, and relied on both state and federal doctrines[11] permitting the waiver of minor irregularities and correction of bid defects which do not go to the price, quantity or quality of the goods or services to be performed. The court also relied on several instances in which the Department had previously permitted submissions of an appropriate Appendix A after opening of bids. Evidently, the proofs with respect to Rossetti's good faith and hiring practices satisfied the court that it was an abuse of discretion to refuse permission to amend.
 
 
 10
 There is, of course, some appeal to the thought that an employer who has demonstrated achievement of the 1974 goal of hiring members of minorities is already serving the purpose of the Plan and that there may be as much or more probability that he will reach the 1975 goal as an employer who merely makes the commitments. The Plan, however, is focussed on the making of the commitment, with its extent increasing year by year, and there is nothing unreasonable in insisting on the commitment as the condition of eligibility.
 
 
 11
 The Chicago Plan was promulgated by the Secretary of Labor to implement Executive Order 11246, requiring furnishing of equal employment opportunity by federal contractors. It was imposed on December 19, 1973 after two prior attempts to develop 'voluntary home town plans' had been deemed 'unacceptable.' 41 C.F.R. 60-11.3. To remedy the perceived ineffectiveness of the voluntary plans, the Secretary implemented an imposed plan which sought to obtain an enforceable commitment from contractors in federally sponsored or assisted projects in the Chicago area to utilize in all their work an acceptable percentage of minority workmen in selected skilled and semi-skilled construction trades during the period of their employment on the project. The lynchpin of this scheme is the ability of the government to enforce good faith compliance with the Plan's objectives. To achieve this enforceability, a contractual obligation is obtained from the contractor by requiring, as a condition precedent to the awarding of the contract, the submission, prior to bid opening, of a properly completed Appendix A.[12]
 
 
 12
 The Plan (Appendix A) not only prohibits award of the contract 'unless the bidder completes and submits, prior to bid opening,' Appendix A, but also provides:
 
 
 13
 'A bidder who fails or refuses to complete or submit such goals shall not be deemed a responsive bidder and may not be awarded the contract or subcontract . . .. In no case shall there be any negotiations over the provisions of specific goals submitted by the bidder after the opening of bids and prior to the award of the contract.'
 
 
 14
 We think the specific provision above quoted is ample to exclude the defect in Rossetti's original Appendix A from the category of minor errors and defects which may be waived or corrected even though the defect does not go to the price, quantity or quality of the services. Similar provisions concering affirmative action commitments are contained in local plans enacted in Philadelphia, Washington, D.C. and other municipal areas.[13] These plans have been consistently interpreted by the Comptroller General, the Department of Labor, and the courts as precluding post-bid-opening amendment of incomplete or unresponsive affirmative action commitments under the conditions of this case. See, e.g., Northeast Construction Co. v. Romney, 157 U.S.App.D.C. 381, 485 F.2d 752, 756-57 (1973);[14] 52 Comp.Gen. 874 (1973); Comp.Gen. Decision B-176171 Aug. 29, 1972); Comp.Gen. Decision B-178839 (Oct. 10, 1973); Comp.Gen. Decision B-180324 (Jan. 16, 1974).[15]
 
 
 15
 Accordingly, we find ample support for the Secretary of Labor's decision challenged here. As was stated by Judge Leventhal, in dealing with a substantially similar problem under an analogous Washington, D.C. Plan: 'What the Washington Plan, and Appendix A, called for was a statement of specific goals for a future period, not as of the time of the bid, and a commitment for a minority utilization. The specific command of the Appendix A regulation clearly states and reiterates a bid lacking the pertinent information concerning projected employers and specific goals will be deemed nonresponsive Whether or not other bidders would be prejudiced by subsequential insertion, the Government's broad policy objective may be prejudiced by the omission.' Northeast Construction Co. v. Romney, supra, 485 F.2d at 759.
 
 
 16
 Moreover, we take note that a contrary position, such as that adopted by the district court, tends to impair the operation of the sealed competitive bidding system. Where a bidder is permitted to correct a deficiency in Appendix A after bid opening, 'the effect . . . would be to permit a bidder who repented his bid-- perhaps on seeing that his bid was too far below the next bidder to be economically sound-- to step away from the matter by simply failing to supply the omission.' Id. 485 F.2d at p. 757.[16] In addition, the district court's position would impose a requirement of a factual hearing, with the attendant possibilities of judicial and appellate review, prior to the awarding of a contract and the commencement of work, in order to assess the good faith or inadvertence of the error and to determine whether the contractor in question was in fact in actual compliance with the utilization goals. The delay and protracted litigation engendered in this case stands as persuasive evidence of the injury which can result, both to the contractors who may well be bound to their original estimates during the pendency of the dispute, and to the general public.[17]
 
 
 17
 Considering the above-stated propositions dispositive, we need not devote extensive analysis to the question of whether general federal procurement regulations or the applicable Illinois law, which both permit waiver or amendment of minor or inconsequential errors after the opening of bids, require the Department of Labor to permit Rossetti to amend its Appendix A. We have concluded that, while admittedly Appendix A does not go to matters of price or quality of work, it has been made a matter of bid responsiveness.[18] Clearly, under either federal or state law, unresponsive bids may not be corrected, after opening, in order to make them responsive. See 41 C.F.R. 1-2.406-3(a); City of Chicago v. Mohr, 216 Ill. 320, 328-29, 74 N.E. 1056 (1905).[19]
 
 
 18
 Accordingly it appears that the Plan makes the submission of an appropriate Appendix a, a matter of responsiveness; nothing in the Plan provides for administrative discretion to permit post-bid-opening amendment; and the position taken by the Department of Labor in this case is within the permissible scope of interpretation of the Plan. The record discloses, however, several instances where the Department has assumed its power to permit a bidder to furnish an appropriate Appendix A after the opening of bids.
 
 
 19
 The question arises whether these instances establish administrative interpretation of the Plan, supporting the existence of discretion in the Department to permit post-bid-opening amendment of an Appendix A so as to bring the bid into compliance.
 
 
 20
 It has been suggested in argument that the agencies' exercise of discretion on these prior occasions was not authorized by law and, therefore, provides no authority for the district court's conclusions. We do not reach the question of validity of those actions, since the facts and circumstances of the prior cases fall well outside the ambit of those presented here.
 
 
 21
 The record discloses that, in each of the five instances in which the federal appellants have permitted a post-bid-opening submission or correction of Appendix A, the bidding documents presented to the prospective bidder by the contracting entity did not contain the Chicago Plan or Appendix A. Thses instances occurred soon enough after the present Plan was promulgated so that the documents appear not to have been available to the agencies inviting bids. The Department of Labor and the EPA considered that, under these particular circumstances, prospective bidders had no opportunity to submit an Appendix A in conjunction with their bids and concluded that it would be unfair to evaluate a submitted bid on the basis of factors which, through no fault of the contractor, were not included in the bid invitation. Accordingly, if all other elements of the bids in question were found to be responsive, the agencies permitted submission of a correctly completed Appendix A after the opening of bids.[20]
 
 
 22
 The facts presented in this case are certainly of a different color. It is undisputed that the bidding documents advertised by Hinsdale Sanitary District incorported fully both the text of the Chicago Plan and Appendix A and, in several instances, informed the prospective bidder of the importance of properly complying with the Plan. Rossetti representatives attended a pre-bid conference where prospective bidders were again reminded of the mandatory nature of Appendix A submissions. Under these facts, we conclude that, regardless of the propriety of the five prior exercises of discretion, there was no showing made of any practice or intention, by either the Department of Labor or the EPA, of permitting amendment of Appendix A after the opening of the bid when the Chicago Plan requirements were properly included within the bid package. At best for Rossetti the five instances intorduced into the Plan a flexibility during an initial perior where circumstances rendered insistence on full compliance more palpably unfair.
 
 
 23
 Accordingly, the federal defendants' present interpretation of the Plan and their application of it to the instant case are neither arbitrary nor unreasonable.
 
 
 24
 The judgment appealed from is reversed and the cause remanded with instructions to dismiss the action. Because of the exigencies of time, indicated by the parties, our judgment to that effect was entered December 30, 1974, noting that the opinion would be later filed.
 
 
 
 [1]
 41 C.F.R. 60-11.1 et seq. issued pursuant to Exec. Order No. 11246, 3 C.F.R. 169 (1974) as amended
 
 
 [2]
 The Chicago SMSA is comprised of Cook, DuPage, Kane, Lake, McHenry and Will counties
 
 
 [3]
 The Chicago Plan provides in pertinent part:
 'No contracts or subcontracts shall be awarded for Federal and Federally-assisted construction in the Chicago, Illinois SMSA on projects whose estimated cost exceeds $500,000 unless the bidder completes and submits, prior to bid opening, the document identified as Appendix A, . . . or a substantially similar document, which shall include specific goals of minority manpower utilization for each trade designated therein which will be used by the contractor on all of his work (both Federal and non-federal) within the Chicago SMSA during the term of his performance of the contract, such goals to be established by the contractor at least within the ranges set forth in Appendix A.' 41 C.F.R. 60-11.21(a).
 
 
 [4]
 Rossetti, in its initial Appendix A submitted prior to the opening of bids, indicated a minority utilization goal for all fifteen designated trades for the contract performance period of 1974 and 1975 of 10%. While 10% Would fall within the mandatory range for minority manpower utilization prescribed in Appendix A by the Secretary of Labor for most of the trades, it was insufficient for 1974 as to Plasterers, 18.8-20.2%; and Operating Engineers, 10.2-13.9%, anf for 1975 as to Plasterers, 20.2-21.6%; Roofers, 12.0-14.0%; Operating Engineers, 13.9-17.6%; and Bricklayers, 10.6-12.5%. See 41 C.F.R. 60-11.23(a) (Appendix A)
 
 
 [5]
 Rossetti's amended Appendix A indicated that, of the fifteen designated trades, it only intended to utilize operating engineers and stated a minority manpower utilization goal of 12% For 1974; 15% For 1975; 18% For 1976; 22% For 1977; and 25% For 1978-- all substantially within the acceptable minimum ranges set forth by the Secretary of Labor in Appendix A. See 41 C.F.R. 60-11.23(2)
 
 
 [6]
 Rossetti asserted that its error in completing Appendix A was clerical in nature and was made in good faith. The Hinsdale waste treatment project at issue here was origianlly bid as a comprehensive project. Rossetti, as a member of a joint venture, submitted a bid on this project. The venture's bid forms were completed by its major participant, advance Construction, and its Appendix A stated a minority manpower utilization goal for 1974 and 1975 of 10%. While the bid was low, it was rejected as being over budget and, thus, the propriety of the 10% Figures was never called into question. When the project was rebid in separate phases, rossetti, allegedly unaware of the noncompliance of the figures utilized in the joint venture bid, erroneously carried over the earlier error of Advance. The district court accepted this explanation in its findings of fact
 
 
 [7]
 In its findings of fact the district court concluded that 'in actuality, of the total manhours worked by operating engineers from January 1 to June 30, 1974 by Rossetti employees, 10.55% Were worked by minority operating engineers. Thus Rossetti was in actual compliance with the goals for 1974. Also, proof has shown that Rossetti's minority utilization has increased from that time to the date of trial and that at this time Rossetti is approaching the standard set for 1975.'
 
 
 [8]
 Loitz Brothers' bid, at $2,041,790, was approximately $55,000 in excess of Rossetti's low bid
 
 
 [9]
 See Note 6, supra
 
 
 [10]
 The testimony indicates that the Rossetti employee who prepared the original Appendix A was aware of the disparity which existed between the PlanS requirements and the actual figures submitted. Thus, because of the agent's knowledge, the findings with respect to inadvertent error and good faith are open to question
 
 
 [11]
 41 C.F.R. 1-2.405 provides in pertinent part:
 'A minor informality or irregularity is one which is merely a matter of form and not of substance or pertains to some immaterial or inconsequential defect or variation of a bid from the exact requirements of the invitation of bids, the correction or waiver of which would not be prejudicial to other bidders. The defect or variation in the bid is immaterial and inconsequential when its significance as to price, quantity, quality or delivery is trivial or negligible when contrasted with the total cost or scope of the supplies or services being procured. The contracting officers shall either give the bidder an opportunity to cure any deficiency resulting from a minor informality or irreguarity in a bid or waive such deficiency which ever is to the advantage of the government.'
 See also, 41 C.F.R. 1-2.406; Albano Cleaners, Inc. v. United States, 455 F.2d 556, 559, 197 Ct.Cl. 450 (1972); City of Chicago v. Mohr, 216 Ill. 320, 329, 74 N.E. 1056 (1905).
 
 
 [12]
 The Chicago Plan makes clear the role of Appendix A in this process: 'Such appendix (A) . . . shall be deemed a part of all contracts executed pursuant to these regulations.' 41 C.F.R. 60-11.21(a)
 
 
 [13]
 See e.g., 41 C.F.R. Chapter 60
 
 
 [14]
 As was indicated in Northeast Construction, a legal question is presented under such circumstances as to the degree of enforceability of any commitment which is tendered in a manner inconsistent with the requirements of the document. We agree with that court that the procurement or compliance officer is not required to resolve such legal questions, which at the very least the working of the Appendix sought to avoid. 'Is not the Government's interest in this commitment important enough to require it in the bid, as filed, in the form of specific goals, without any question as to supplementation, and without any if, ands, or buts?' Id
 
 
 [15]
 Concerning post-bid-opening amendments of errors in the bidder's affirmative action commitment, the Comptroller General has concluded:
 'a bidder who fails to make such (pre-bid-opening) commitment may not have the deviation waived, nor may the bidder be permitted to correct the deficiency after bid opening in an effort to render the bid eligible for award.' Comp.Gen. Decision B-180324 (Jan. 16, 1974).
 
 
 [16]
 Of course, it may be argued that this problem could be obviated by requiring the federal government to waive any errors contained in a flawed Appendix A when the contractor could be shown to be in present compliance with utilization goals. Waiver of such a crucial and important concern as obtaining an enforceable commitment to observe federal standards of minority hiring during the term of participation on a federally involved contract, however, is clearly not envisioned under the language of the Plan
 
 
 [17]
 The Chicago Plan has recognized this competing concern of delay, and has resolved the difficulty by seeking only the commitment of utilization prior to contract award. During performance, compliance investigation proceeds with sanctions available for failure to honor the commitment. Thus, compliance is not ignored under the Plan, as Rossetti argues
 
 
 [18]
 It is will established that the procurement process, once exclusively concerned with price and quality of goods and services, has been increasingly utilized to achieve social and economic objectives only indirectly related to conventional procurement considerations. The attenuated relationship to price, quantity or quality, however, does not necessarily limit the power of Congress or the president to condition award of a contract on full and proper compliance. See, e.g., Northeast Construction Co. v. Romney, supar, 485 F.2d at 760-61; Contractos Ass'n of Eastern Pa. v. Secretary of Labor, supra, 442 F.2d at 170
 
 
 [19]
 We thus need not decide the question presented by Loitz Brothers as to whether the general procurement regulations relied on by Rossetti and the district court, see note 11, supra, are applicable in projects where federal participation is limited to the role of partial funding. See, Shaw-Henderson, Inc. v. Schneider, 335 F.Supp. 1203, 1215 (W.D.Mich.1971), aff'd, 453 F.2d 748 (6th Cir. 1972)
 
 
 [20]
 In the instance of the Joliet contract awarded to Advance Construction Company, permission was granted to amend a faulty Appendix A after bid opening. While testimony at trial appears to indicate that the decision was reached on the assumption that the bidding materials contained the Chicago Plan and Appendix A, it is clear from the record that, as with the other four projects, the bidding materials did not contain any reference to the Plan and the initial faulty submission was provided on the initiative of Advance. Accordingly, all of the instances of prior conduct are factually distinguishable from the instant controversy and we have no occasion to reach their validity or authority. Even if the decision of an employee of the department in the Joliet-Advance instance were not explained on the basis that the Appendix A was not made available to the bidder, such signle decision of an employee would not establish an administrative construction, binding on the department