WALSH/II IN ONE JOINT VENTURE III *et al.*, Plaintiffs-Appellants, v. METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO *et al.*, Defendants-Appellees (F.H. Paschen, S.N. Nielsen/IHC Construction Joint Venture, Intervening Defendant-Appellee).

First District (5th Division)   No. 1—08—3167

Opinion filed March 20, 2009.

Kevin M. Forde, Joanne R. Driscoll, and Kevin R. Malloy, all of Kevin M.

Forde, Ltd., and Peter B. Carey and Kathleen Hartmann, both of Law Offices of Peter B. Carey, both of Chicago, for appellants.

Frederick M. Feldman, Helen Shields-Wright, and Bonnie T. Kennedy, all of Metropolitan Water Reclamation District Law Department, of Chicago, for appellees Metropolitan Water Reclamation District of Greater Chicago and Darlene A. LoCascio.

Edward J. Burke, Ellen B. Epstein, and Amanda Ripp, all of Burke Burns & Pinelli, Ltd., of Chicago, for appellee F.H. Paschen, S.N. Nielsen/IHC Construction Joint Venture.

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

The instant cause involves an interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (166 Ill. 2d R. 307(a)(1)).

Plaintiff-appellant Walsh/II In One Joint Venture III, a joint venture as formed between plaintiffs-appellants Walsh Construction Company, an Illinois corporation, and II In One Contractors, Inc., an Illinois corporation (Walsh), filed a cause of action seeking a preliminary injunction against defendants-appellees Metropolitan Water Reclamation District of Greater Chicago, an Illinois municipal corporation (District), and Darlene A. LoCascio, in her official capacity (LoCascio), to prevent them from recommending the award of, or awarding, a certain contract on a project to another bidder. Intervening defendant-appellee F.H. Paschen, S.N. Nielsen/IHC Construction Joint Venture (Paschen) was granted leave to intervene as a party-defendant and, along with the District, moved for a directed finding pursuant to section 2—1110 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2—1110 (West 2006)) following a hearing on Walsh's motion for preliminary injunction. The trial court granted the District and Paschen's motions for directed finding and denied Walsh's motion for preliminary injunction.

Walsh appeals, contending that the trial court erred in determining as a matter of law that it failed to establish a *prima facie* case of a clear right in need of protection, and that all the other requirements for a preliminary injunction exist in this case. Walsh asks that we reverse the trial court's order granting the District and Paschen's motions and denying Walsh's motion, and either *sua sponte* enter a preliminary injunction or remand the matter for further proceedings. For the following reasons, we affirm.

BACKGROUND

On July 16, 2006, the District announced an invitation to bid on

contract No. 07—220—P3, which pertained to a project with an estimated cost of $244,600,000, known as the Primary Settling Tanks and Grit Removal Facilities at the Calumet Water Reclamation Plant. In the bid packets it made available to all potential bidders, the District provided instructions outlining the requirements necessary for a valid and responsive bid. These included a copy of the District's Affirmative Action Ordinance and Revised Appendix D (Ordinance, Appendix D) specifying the requirement that all bidders provide a "Utilization Plan" signed by the bidder. Sections 8 and 9 of the Ordinance, as included in the pre-bid packet, state:

"Section 8. Utilization Plan and Review

(a) Each contractor shall submit with its bid a completed and signed Utilization Plan ***. *** The contractor is required to sign the Utilization Plan ***.

(b) Each contractor shall include with its bid, a signed and completed Utilization Plan ***. *** Failure to submit the Utilization Plan signed by the contractor at the time of the bid opening *** will be viewed as nonresponsive and the bid will be rejected. ***

* * *

Section 9. Compliance Review and Enforcement

(a) Review of Bid Submission Responsiveness

(i) The Purchasing Agent of the District ('Purchasing Agent') shall review each bid submission on a contract to determine if the contractor included in the submission a completed and signed Utilization Plan required by Section 9 herein.

(ii) The Purchasing Agent shall declare the bid submission nonresponsive where a contractor (a) failed to submit with its bid a completed and signed Utilization Plan ***." Affirmative Action Ordinance Appendix D of the Metropolitan Water Reclamation District of Greater Chicago §§8, 9 (rev. December 6, 2007).

Also included in the pre-bid packets provided by the District to the potential bidders was a copy of the Utilization Plan and its signature page, labeled page D-25. This page, which requests a bidder to swear under oath that the affirmative action subcontractor information the bidder provides is true and correct, states:

**"The Bidder is required to sign and execute this page."** (Emphasis in original.)

Page D-21 of the Utilization Plan also states:

**"IF A BIDDER FAILS TO INCLUDE signed copies of the Utilization Plan at the time of the bid ***, said bid will be deemed nonresponsive and rejected.**

**All Bidders must sign the signature page of the Utilization Plan."** (Emphasis in original.)

In addition to these statements in Appendix D and the Utilization Plan, several other documents provided by the District in its pre-bid packets warned that a bidder's signature was required on page D-25 in order for the bid to be considered. For example, page I-4 of the "Invitation to Bid," page P-4 of the "Proposal" and page A-35 of the "Agreement" all contain the following statement:

> "**The bidder must sign the signature page, D-25 of the Utilization Plan. Failure to submit the Utilization Plan signed by the bidder on page D-25 will be reviewed as non-responsive and the bid will be rejected.** \*\*\* The Utilization Plan **MUST** be signed by the bidder \*\*\*." (Emphasis in original.)

Echoing this, page P-4X of the Proposal and page A-31X of the Agreement state:

> "All bidders must submit with their proposals a signed and complete Utilization Plan \*\*\*. *The bidder must sign the signature page, D-25 of the Utilization Plan. Failure to submit the Utilization Plan signed by the bidder on page D-25 will be reviewed as non-responsive and the bid will be rejected.*" (Emphasis in original.)

Page P-5X of the Proposal also states:

> "The Utilization Plan **MUST** be signed by the bidder." (Emphasis in original.)

In August 2008, the District required all potential bidders to attend a mandatory pre-bid conference. Walsh attended this meeting, as did Paschen. At the meeting, the senior compliance officer with the District's affirmative action section, Lindsey Gayles, reviewed with the bidders all of the requirements related to the District's Ordinance. Highlighting several important bid responsiveness items for the potential bidders, Gayles specifically addressed Appendix D and, particularly, the Utilization Plan. Gayles informed the bidders that they were required to submit a signed and completed Utilization Plan and told them where exactly within their pre-bid packets they could find page D-25. Discussing the contents of page D-25, Gayles reminded the bidders of the importance of that page and, drawing their attention to the underlined and bold text, instructed them several times that they were required to sign page D-25 or their bid would be considered "as materially in non-compliance."

Bids on the project were due September 30, 2008. On that date, four bidders, including Walsh and Paschen, submitted bids and attended the District's public opening of the bids. When the District's representatives opened the bids, they noted that Walsh's bid was the lowest of the four, by approximately $10 million. However, purchasing agent LoCascio immediately noted that Walsh's bid failed to contain the required signed page D-25 of the Utilization Plan. Two of the

District's officers reviewed the bid and confirmed LoCascio's findings. All the bids were then removed and brought to a conference room where Walsh's bid was further examined; again, District officials could not find a signed page D-25 in Walsh's bid documents. As it had done with bids on previous projects, the District deemed Walsh's bid nonresponsive because of Walsh's failure to include a signed page D-25. The District informed Walsh of this on October 2, 2008.

The remaining three bids all conformed to the bidding requirements, including the attachment of a signed page D-25. Of these three, Paschen provided the lowest bid.

On October 22, 2008, Walsh filed a three-count complaint against the District, seeking declaratory judgment, injunctive relief and *mandamus* asking the trial court to declare the Ordinance illegal, to compel the District to accept its bid and to order the District to award the contract to Walsh. Essentially, Walsh argued that its failure to include a signed page D-25 was an immaterial variance from what was required and, thus, the District improperly rejected its bid, which was the lowest among all the bidders. On October 23, 2008, Walsh also filed an emergency motion for temporary restraining order and preliminary injunction. Paschen was permitted to intervene as a party-defendant. In addition to opposing the motion for temporary restraining order, both the District and Paschen filed motions to dismiss Walsh's complaint.

On October 31, 2008, following a hearing, the trial court denied Walsh's motion for temporary restraining order. First, the court noted that Walsh had a right to a fair bidding process. However, the court noted that Walsh failed to provide any evidence that the District's bidding process in this case was unfair or that the District went on to award the contract to another bidder who failed to comply with the stated requirements. The court also focused on the "numerous occasions" and the several places in the bidding documents which informed all the bidders, including Walsh, of the importance of providing a signed page D-25 with their bids. The court stated that what would actually be unfair "is if [Walsh] were allowed to circumvent the clear requirement and still be considered for the contract." The court continued by explaining that its failure to sign page D-25, after having been warned of the consequences, "may have given [Walsh] a competitive edge by allowing [it] to negotiate with the minority subcontractors after it won the contract." Therefore, and because it recognized that the District's purchasing agent has the authority and discretion to determine the lowest responsive bid and did so with a reasonable basis here, the trial court held that Walsh had not shown it had a clearly ascertainable right in need of protection in this instance and,

thus, the court refused to interfere absent any fraud, abuse of discretion or manifest injustice on the part of the District.

Also on October 31, 2008, LoCascio advised the District's board of commissioners that Walsh's bid was rejected for its failure to submit a signed page D-25 and, instead, recommended that the contract be awarded to Paschen as the lowest responsive bidder.

In early November 2008, the trial court denied the District and Paschen's motions to dismiss and held a hearing on Walsh's motion for preliminary injunction. Meanwhile, the District, via a regular meeting of its board of commissioners, awarded the contract to Paschen; Paschen signed the contract.

At the hearing on Walsh's motion for preliminary injunction, LoCascio testified that it was her job as the District's purchasing agent to review the bids on the project and that, when she reviewed Walsh's bid, it was missing signature page D-25. LoCascio explained that a completed and signed Utilization Plan meant that the bidder could not change its named subcontractors therein, their amount of work or the description of their work after the bid was opened. LoCascio acknowledged that Walsh's signature appeared on page P-8X of the Proposal, which stated that "[t]he bidder hereby accepts the invitation of [the District] to submit this proposal with the understanding that it will not be canceled or withdrawn," but stated that she believed the bidder's obligation to sign and submit page D-25 is a material requirement to the bid as specified by the District because it is within the Utilization Plan that the bidder commits to using the subcontractors listed. LoCascio further testified that she did not choose to accept or reject Walsh's bid, but followed the mandates of the Ordinance. LoCascio also described that, as purchasing agent, she has received eight bids in the last year that did not contain a signed page D-25 and, as here, she has rejected all of them based solely on this nonconformity.

David Shier, a program manager and one of those who prepared Walsh's bid on the project, testified that Walsh signed the Proposal as part of the pre-bid documents with the understanding that no part of the bid could be changed or withdrawn after it was submitted, including the Utilization Plan and the commitments to the subcontractors made therein. Shier also testified that Walsh timely submitted, as required, letters of intent from the subcontractors it had listed in the Utilization Plan, identifying them and describing their work to be performed. However, Shier admitted that a representative of Walsh attended the pre-bid conference and that Shier had reviewed all the instructions contained in the pre-bid packet. Shier acknowledged several places in the pre-bid instructions and the bidding documents alerting bidders to the requirement of submitting a signed page D-25,

and he admitted that he knew of this when he prepared Walsh's bid. Shier further testified that after Walsh was informed that its bid was missing a signed page D-25, he went to the District's offices and reviewed Walsh's bid, as well as those of the other bidders, and noted that Walsh's bid was indeed missing that page.

Following Walsh's case-in-chief, the District and Paschen moved for a directed finding pursuant to section 2—1110 of the Code. On November 13, 2008, the trial court issued a written ruling granting the District and Paschen's motions and denying Walsh's motion for preliminary injunction. In its order, the court examined the facts in the cause, including the pre-bid meeting, the oral and written warnings requiring a signed page D-25, what occurred during the bid on the project, and the arguments presented at the hearing. In issuing its decision, the court looked first to the power of the District and noted that, as a public body, it has discretion in determining the lowest responsible bidder, barring claims of fraud, lack of authority, unfair dealing, favoritism or other arbitrary conduct. The court noted that Walsh had not raised any of these infirmities and that it was clear the District followed its own Ordinance in rejecting the bid. Next, the court commented that the District's enabling statute allows it to establish procedures it deems appropriate to comply with the Ordinance, and as Walsh presented no evidence to the contrary, the Ordinance itself is not "unlawful." Turning to Walsh's argument that its failure to sign page D-25 was not a material variance because it had signed page P-8X of the Proposal certifying that its bid could not be "canceled or withdrawn," the court examined the language of the two pages and found that they ask for different assurances regarding the project; while page P-8X talked about cancellation and withdrawal, the "purpose of signing page D-25 was to bind [Walsh] to the Utilization Plan." The court stated that Walsh's signature on the proposal was

> "not an adequate substitute because, under the plain language of the signature page, the bidder only agrees not to cancel or withdraw its bid; the bidder does not agree to be bound by the Utilization Plan nor does the bidder agree not to renegotiate with its minority subcontractors."

This, found the court, gave Walsh a "substantial advantage or benefit not enjoyed by other bidders." Moreover, the court noted another such advantage in that Walsh's failure to sign page D-25 violated a condition precedent to the contract, allowing Walsh the opportunity to later " 'walk away' " from the contract on the ground that its bid was nonconforming. Based on all this, the court concluded that Walsh "failed to establish a *prima facie* case that [it has] a certain and clearly

ascertainable right in need of protection and therefore [Walsh] is not entitled to preliminary injunctive relief."

## ANALYSIS

As a threshold matter, we note that the parties disagree regarding the appropriate standard of review to be employed here. Walsh asserts a *de novo* standard, arguing that the order entered below "shows that the court did not weigh the evidence" but, rather, decided as a matter of law that Walsh failed to establish a *prima facie* case. Both the District and Paschen, however, assert a manifest weight of the evidence standard, noting that the court indeed considered the weight of the testimony and evidence presented in making its decision and did not, as Walsh insists, simply deny the request for preliminary injunction as a matter of law. Based on the record before us, we agree with the District and Paschen that a deferential standard is required.

Walsh appeals from the trial court's decision denying its motion for preliminary injunction and granting the District and Paschen's motions for directed verdict. The decision to deny a motion for preliminary injunction lies within the sound discretion of the trial court, and a reviewing court may not disturb this decision absent a clear abuse of that discretion. See *Keefe-Shea Joint Venture v. City of Evanston*, 364 Ill. App. 3d 48, 55 (2005). Such an abuse occurs only when no reasonable person would take the view of the trial court. See *Keefe-Shea*, 364 Ill. App. 3d at 55, citing *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005).

Moreover, ruling on a motion for directed verdict pursuant to section 2—1110 of the Code involves a two-prong analysis. See *Baker v. Jewel Food Stores, Inc.*, 355 Ill. App. 3d 62, 66 (2005), citing *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003); see also *In re Estate of Phelan*, 375 Ill. App. 3d 875, 881 (2007). First, the trial court must determine, as a matter of law, whether the plaintiff presented a *prima facie* case by offering at least some evidence on the essential elements of its cause of action. See *Phelan*, 375 Ill. App. 3d at 881; *Baker*, 355 Ill. App. 3d at 66. If the plaintiff fails to do so, the trial court must grant a directed verdict and, because the establishment of a *prima facie* case is a matter of law, a reviewing court will examine this decision *de novo*. See *Phelan*, 375 Ill. App. 3d at 881; *Baker*, 355 Ill. App. 3d at 66. However, if the trial court determines that the plaintiff has established a *prima facie* case, the court moves to the second prong of this analysis in which it, as a finder of fact, must consider the totality of the evidence presented, including that favorable to the defendant, to weigh its quality and the credibility of the witnesses. See *Phelan*, 375 Ill. App. 3d at 881; *Baker*, 355 Ill. App. 3d at 66. From this, the

court draws reasonable inferences to determine whether sufficient evidence remains to establish the plaintiff's *prima facie* case and, if the court finds that it does not, it must grant the directed verdict for the defendant. See *Phelan*, 375 Ill. App. 3d at 881; *Baker*, 355 Ill. App. 3d at 66-67. When the analysis has progressed to this point, a reviewing court affords deference to the trial court and will not reverse its decision unless it is against the manifest weight of the evidence. See *Phelan*, 375 Ill. App. 3d at 881; see also *Baker*, 355 Ill. App. 3d at 67, citing *Sherman*, 203 Ill. 2d at 276.

Although Walsh is correct that the trial court stated it "failed to establish a *prima facie* case" and was not entitled to preliminary injunctive relief, Walsh's conclusion from this that the court did so purely as a matter of law is wholly inaccurate. Rather, contrary to its assertions, it is evident that the court made credibility findings and, in particular, weighed the quality of the evidence. In its order, which comprised eight pages originating from two days of hearings, the court began by examining the facts in the cause, including the pre-bid meeting, the oral and written warnings requiring a signed page D-25 and what occurred during the project bidding. It discussed in detail several portions of the pre-bid documents, Appendix D and the Ordinance, and made comparisons and contrasts between page D-25 and page P-8X, which Walsh contended was an adequate substitute for a signature page. From all this, it is clear to us that the court did not find that Walsh failed to establish its *prima facie* case as a matter of law but, rather, made this decision as a fact finder after considering the totality and quality of the evidence presented and drawing reasonable inferences therefrom, thus meriting deferential review. See *Phelan*, 375 Ill. App. 3d at 881; see also *Baker*, 355 Ill. App. 3d at 67, citing *Sherman*, 203 Ill. 2d at 276.

■ Turning now to the merits of this cause, we begin by noting that Walsh has not challenged the legality or validity of the Ordinance here. Rather, it acknowledges, as do the District and Paschen, that the District is a non-home-rule entity deriving its powers from the legislature, including its ability to "establish such procedures as it deems appropriate to comply with state or federal regulations as to affirmative action and the utilization of small and minority businesses in construction and procurement contracts." 70 ILCS 2605/11.3 (West 2006); see also *Leo Michuda & Son Co. v. Metropolitan Sanitary District of Greater Chicago*, 97 Ill. App. 3d 340, 343 (1981). Indeed, such ordinances enacted by these entities are presumed valid (see *Serpico v. Village of Elmwood Park*, 344 Ill. App. 3d 203, 209 (2003), citing *Chavda v. Wolak*, 188 Ill. 2d 394, 398 (1999)), and our courts have held that public officials cannot be enjoined if they act within the

authority of such ordinances absent fraud, favoritism or other arbitrary conduct. See *Williams Brothers Construction, Inc. v. Public Building Comm'n*, 243 Ill. App. 3d 949, 957 (1993) (governmental agency has broad discretion in awarding contract, and court is to defer to its decision absent abuse of discretion or manifest injustice).

Instead, Walsh's challenge goes to the actions taken by the District in this case. Walsh asserts that the District erroneously elevated an immaterial variance, namely, Walsh's failure to submit a signed page D-25 with its bid, to a material one thereby infringing on Walsh's clear and protected right to participate in a fair bidding process. We disagree.

Walsh is correct that a bidder has the right to participate in a fair bidding process. See *Keefe-Shea Joint Venture v. Evanston*, 332 Ill. App. 3d 163, 172 (2002). However, this is not without qualification. For example, bids must conform to the advertised requirements of the invitation to bid. See *Michuda*, 97 Ill. App. 3d at 344; see also *Keefe-Shea*, 332 Ill. App. 3d at 171. While a variance from these requirements that is "minor" does not require rejection of the proposed bid, a variance that is "material" will require such rejection. See *Michuda*, 97 Ill. App. 3d at 344. This is because a bid containing a material variance is a nonresponsive bid, since it is not in line with the contract offer as advertised. See *Michuda*, 97 Ill. App. 3d at 344; accord *Bodine Electric of Champaign v. City of Champaign*, 305 Ill. App. 3d 431, 436 (1999). The test of whether a variance is material "is whether it gives a bidder a substantial advantage or benefit not enjoyed by other bidders." *Michuda*, 97 Ill. App. 3d at 344; accord *Bodine*, 305 Ill. App. 3d at 436. Again, in accordance with the District's powers discussed above, we note that discretion lies with the public body advertising the invitation to bid, barring fraud, unfair dealing, favoritism or other arbitrary conduct, to determine the lowest responsive bidder. See *Bodine*, 305 Ill. App. 3d at 440, citing *Court Street Steak House, Inc. v. County of Tazewell*, 163 Ill. 2d 159, 165 (1994); see also *Williams Brothers*, 243 Ill. App. 3d at 957 (agency's discretion in awarding contract "extends to the determination of whether a given bid is responsive" and courts are to defer to its "determination of responsiveness as long as that determination has a reasonable basis").

There is a strong line of case law that, while cited by all the parties to this appeal, clearly supports the District and Paschen's position that the variance in Walsh's bid was material and, therefore, justified the District's rejection of it.

In *Michuda*, defendant sanitary district advertised for bids on a project. Similar to the instant cause, part of the district's bidding instructions was an appendix D, entitled "Notice of Requirements for

Affirmative Action Plan to Insure Small and Minority Business Participation." This appendix required that potential bidders submit with their bidding documents a "Goal Disclosure Form" listing the minority subcontracts they would award to minority and small businesses if their bid were accepted. Four companies, including Brant Construction Company and plaintiff Michuda, submitted bids; once opened, it was revealed that Brant's bid was the lowest, followed by Michuda. However, upon examination, the district discovered that although Brant had submitted a Goal Disclosure Form, the form had not been completed in accordance with the requirements of appendix D since, though Brant stated therein its intent to award subcontracts to minorities and small businesses, it did not list any of these. Michuda, meanwhile, had submitted a Goal Disclosure Form which was properly completed. The district's board of trustees declared it was awarding the contract to Brant regardless of the error and Michuda initiated suit. At trial, the court found that Brant had failed to comply with the requirements of the bidding documents and that this failure was a material omission, thereby rendering Brant's bid nonresponsive. See *Michuda*, 97 Ill. App. 3d at 342-43.

On appeal, the *Michuda* court agreed with the trial court's determination. After outlining the test for materiality, it found that appendix D set forth a mandatory requirement that each bidder submit a Goal Disclosure Form. See *Michuda*, 97 Ill. App. 3d at 345. It was not enough that Brant merely stated an intent in the form to use minority and small businesses; rather, the form stated that these must be listed as evidence of the bidders' commitment to the project and to follow the principles of appendix D. See *Michuda*, 97 Ill. App. 3d at 345. The *Michuda* court reasoned that Brant's failure to do so resulted in a variance with the bid requirements as advertised. See *Michuda*, 97 Ill. App. 3d at 345. In deciding whether this variance was material, the court found that it was, since it gave Brant a substantial advantage not enjoyed by the other bidders because, with only an intent and not a commitment to specific subcontractors as required, Brant had the ability to negotiate with any subcontractor it wanted after having already submitted its bid. See *Michuda*, 97 Ill. App. 3d at 345. Accordingly, the *Michuda* court concluded that Brant's bid was nonresponsive and that the district should have awarded the contract to Michuda instead. See *Michuda*, 97 Ill. App. 3d at 345.

Similarly, in *Bodine*, defendant city advertised an invitation to bid on an expansion project, with the condition, as contained in its bid packet instructions and a city ordinance, that bidders post a 10% bid bond. Following bidding, plaintiff Bodine Electric had submitted the lowest bid. However, it was soon discovered that Bodine had submit-

ted only a 5% bid bond, instead of the required 10%; the next lowest bidder, Potter Electric, had complied with all the requirements of the bidding instructions. Upon a pre-award meeting between the city and Potter, Bodine filed a complaint seeking injunctive and declaratory relief. The trial court held against Bodine, finding that not only was the bid requirement clear in the pre-bid package and in the city ordinance, but also that Bodine's variance from it gave Bodine a substantial advantage over other bidders and, thus, was material and rendered its bid nonresponsive. See *Bodine*, 305 Ill. App. 3d at 435, 437.

On appeal, the *Bodine* court affirmed. Expounding on the trial court's reasoning, it noted that while Bodine may remain bound by its bid, it was not bound to the same extent as other bidders. See *Bodine*, 305 Ill. App. 3d at 437. Rather, since its bid bond was insufficient, Bodine had an advantage because it would lose significantly less money in liquidated damages if it chose to walk away from the project. See *Bodine*, 305 Ill. App. 3d at 437. Further, the *Bodine* court noted that, had the city concluded that this variance was not material and waived it, the city "would then have been in the difficult position of characterizing one of its ordinances *** as an informality" and "could have just as easily been sued" by Potter for violating its own ordinance. *Bodine*, 305 Ill. App. 3d at 440. Instead, because the city appropriately followed its pre-bid instructions and its ordinance, there was no fraud, lack of authority, unfair dealing, favoritism or similar arbitrary conduct requiring reversal. See *Bodine*, 305 Ill. App. 3d at 440.

In line with *Michuda* and *Bodine* is *George W. Kennedy Construction Co. v. City of Chicago*, 135 Ill. App. 3d 306 (1985), *vacated on other grounds*, 112 Ill. 2d 70 (1986), which is perhaps the most factually analogous to the instant cause. In *Kennedy*, the defendant city advertised a bid for a water main project; its pre-bid package comprised multiple sections of documents and, in particular, included one section entitled "Proposal and Acceptance" setting forth the bidder's proposed terms for the project, the signature page for the bidder and the page to be utilized by the city were it to accept that bidder's offer. The instructions on the signature page read:

> " '[I]n the event that this bid is executed by other than the President [of the bidding corporation], attach hereto a certified copy of that section Corporate By-laws or other authorization by the Corporation which permits the person to execute the offer for the corporation.' " *Kennedy*, 135 Ill. App. 3d at 309.

Following this was a line for attestation by the corporate secretary. Plaintiff Kennedy, as well as the joint venture of Reliable Contracting & Equipment Company and Abbott Contractors, Inc., submitted bids.

When the city opened the bids, Kennedy was found to be the lowest bidder. However, upon examination, it was revealed that, while the signature page contained the corporate name, address and secretary attestation, it was not executed by Kennedy's president or anyone other than the president with the required attached authorization. When the city notified Kennedy that its bid was nonresponsive, Kennedy, as Walsh here, filed a complaint for declaratory and injunctive relief, temporary restraining order, and preliminary and permanent injunction, seeking to be awarded the contract and prohibiting the city from awarding it to anyone else. As had the city, the trial court found that Kennedy's bid was not responsive, stating that while it would cost taxpayers additional money, it could not " 'upset the bidding process' " that was in effect because to do so would open a " 'Pandora's box to all sorts of games.' " *Kennedy*, 135 Ill. App. 3d at 310.

On appeal, the *Kennedy* court stated that the principle issue was whether the omission of Kennedy's president's signature on the signature page created a material variance rendering Kennedy's bid nonresponsive. See *Kennedy*, 135 Ill. App. 3d at 310. After citing the same case law we have here regarding material variances, the *Kennedy* court answered the question in the affirmative because it found that Kennedy enjoyed a substantial advantage over other bidders. See *Kennedy*, 135 Ill. App. 3d at 310-11. The court noted that "[i]t was incumbent upon all bidders to conform their bids to the requirements of the advertisements for bids and the instant bid package prepared and issued by the city specifically required that all bids be executed." *Kennedy*, 135 Ill. App. 3d at 311. The signature page required either the president's signature or the signature of a party authorized to sign for the corporation with the appropriate certification attached; Kennedy provided none of this, thus failing to execute the bid. See *Kennedy*, 135 Ill. App. 3d at 311.

Kennedy argued to the reviewing court that this was immaterial, since its president had signed the bid package in seven different locations and, accordingly, this was sufficient to bind it, or provided sufficient evidence that it intended to be bound, to its bid. See *Kennedy*, 135 Ill. App. 3d at 312. The *Kennedy* court did not accept this argument. Instead, it noted that a signature on the signature page at issue was the operative signature to bind a bidder to its bid, since it was this page that concluded the "Proposal and Acceptance" section providing the bidder's proposed contract terms and other commitments. See *Kennedy*, 135 Ill. App. 3d at 311. Because Kennedy did not sign it, Kennedy was not bound to the terms of its bid and, if awarded the contract, could walk away at any time, thereby placing it in an

advantageous position over other bidders. See *Kennedy*, 135 Ill. App. 3d at 311. Moreover, the *Kennedy* court found that none of the seven other places in the bid that Kennedy's president signed were adequate substitutes for the signature page. See *Kennedy*, 135 Ill. App. 3d at 312. Rather, they were "agreements subsidiary to the contract" and did not represent any binding commitment. *Kennedy*, 135 Ill. App. 3d at 312. Accordingly, the *Kennedy* court concluded that the trial court's decision that the variance was material and rendered Kennedy's bid nonresponsive was proper. See *Kennedy*, 135 Ill. App. 3d at 314.

The instant cause mirrors *Michuda*, *Bodine* and *Kennedy* and merits the same result. Although Walsh may have a clear and ascertainable right in general to a fair bidding process, that right was not in need of protection under the circumstances presented, warranting injunctive or declaratory relief. In fact, there is nothing in the record to indicate that Walsh's right was ever at risk of being curtailed.

First, Walsh fails to point to any action taken by the District demonstrating unfairness in the bidding process or comprising fraud, lack of authority, unfair dealing, favoritism or similar arbitrary conduct when the District rejected its bid as nonresponsive and awarded the contract to Paschen. Pursuant to section 11.3 of its enabling statute, the District was "expressly authorized to establish" procedures it considered necessary to comply with regulations involving affirmative action and the utilization of small and minority business in, as here, construction and procurement contracts. 70 ILCS 2605/11.3 (West 2006). Accordingly, the District established sections 8 and 9 of the Ordinance and Appendix D. As we outlined at the beginning of this cause, section 8 mandates that every bidder sign a Utilization Plan and makes rejection of its bid a consequence of failing to do so, while section 9 orders the District's purchasing agent to, without any discretion, review each bid to determine if the bidder completed and signed the required Utilization Plan and to declare the bid nonresponsive if it failed to do so. Affirmative Action Ordinance Appendix D of the Metropolitan Water Reclamation District of Greater Chicago §§8, 9 (rev. December 6, 2007). The record is clear that the District included in its pre-bid packets given to each potential bidder on the project a copy of the Ordinance and Appendix D, including sections 8 and 9.

In addition, as we pointed out earlier, there were several other places in the pre-bid documents that outlined for Walsh and all the bidders, in various fonts and with several marks of emphasis such as boldface and underlining, the requirement of submitting a signed page D-25. These included pages D-25 itself and D-21 of the Appendix; I-4 of the Invitation to Bid; P-4, P-4X and P-5X of the Proposal and A-31X

and A-35 of the Agreement. Walsh also undisputably, along with all the other bidders, attended the District's mandatory pre-bid meeting during which senior compliance officer Gayles highlighted several important bid responsiveness items, drawing the bidders' close attention to page D-25 with specificity. Gayles orally told the bidders that they were required to submit this signed page as their commitment to the project and the use of minority subcontractors and warned them, in no uncertain terms, that the failure to do so would render any bid materially noncompliant with the project offer.

Of the four bidders on this project, every one of them, save Walsh, submitted a timely, completed and signed page D-25 with their bids. While Walsh's bid was the lowest, it failed to follow this requirement, which was clearly advertised as a key part of the project offer. Therefore, Walsh committed a variance. The District went on to award the project to the next lowest bidder, Paschen, which, following an examination of its bid, was found to be in complete compliance with all the requirements, including a signed page D-25. Thus, it was not as if the District refused to award the contract to Walsh in favor of another that had not complied. Also, purchasing agent LoCascio testified that a completed and signed Utilization Plan means a bidder cannot change its named subcontractors therein, their amount of work or the description of their work after the bid is opened; it is with this page that the bidder commits to using the subcontractors listed. LoCascio did not choose to accept or reject Walsh's bid but, as she had already done eight times that year, only followed the mandates of the Ordinance which require her without discretion to reject bids which did not contain a signed page D-25.

From all this, then, it is clear to us that, contrary to Walsh's contention, the bidding process was entirely fair.

What occurred here had nothing to do with the District's actions during the bidding process or award of the contract but, rather, with Walsh's inactions in submitting its bid. Walsh's program manager Shier admitted that he knew attaching a signed page D-25 to Walsh's bid was a requirement for the project and that Walsh had not done so. This, then, created, by Walsh's own hand, a variance. A review of the circumstances in relation to the test for materiality clearly demonstrates that Walsh's bid was nonresponsive. This is because, as we conclude in agreement with the trial court, Walsh's variance was undeniably material. Page D-25 sought an assurance on the project that the bidder be bound to the Utilization Plan and its contents. As LoCascio testified, and as is evident from a reading of page D-25, the Utilization Plan asks the bidders to state at the time of their bid the identity of the minority subcontractors they will work with on the

project, the amount of work they will do and what that work will be, to see if it fits the auspices of the Ordinance's purposes. The bidder's signature on page D-25 binds the bidder under oath to work with these subcontractors and to work with them within the scope promised. Without a signature, there is nothing to bind the bidder to either the Utilization Plan as a whole or to the specific terms it may have filled in, if partially completed. This frees the bidder, were it to be awarded the contract despite the lack of signature, to renegotiate with any minority subcontractors named in a partially complete Utilization Plan (or hire other subcontractors not even mentioned) regarding the work to be done and prices to be paid. We cannot imagine a more substantial advantage than this, which left Walsh enjoying the ability to remain unbound to a Utilization Plan due to its failure to sign page D-25, while every other bidder remained bound because they followed all the requirements as advertised.

This was not the only advantage Walsh enjoyed in the instant cause. As *Michuda*, *Bodine* and *Kennedy* make clear, the District's advertisement of the project and the bidding requirements essentially notified all potential bidders of the conditions precedent to the award of the project, *i.e.*, the offer awaiting acceptance which would result in the formation of a contract. One of these conditions precedent was the submission of a signed page D-25 with the bid. When Walsh failed to submit this, it did not accept the District's offer; instead, it rejected it and proposed a counteroffer. Awarding Walsh the contract would give Walsh the supreme advantage of being able to later walk away from the project, should anything prompt it to do so, asserting that its bid was nonconforming and no contract was ever formed between it and the District. Again, this clearly shows that Walsh's failure to submit a signed page D-25 was a material variance rendering its bid nonresponsive.

As Kennedy did in its respective case, Walsh here presents the argument that its failure to submit a signed page D-25 was immaterial since it signed page P-8X of the Proposal, which states, "[t]he bidder hereby accepts the invitation of [the District] to submit this proposal with the understanding that it will not be canceled or withdrawn." Walsh insists that by signing this, it believed that it was bound to the terms and conditions of the contract to do all the work required thereunder and could not cancel, withdraw or renegotiate any portion of its bid on the project once it submitted its bid—thereby placing it in the same position as Paschen and all the other bidders that submitted a signed page D-25. However, just as the *Kennedy* court, we refuse to accept this argument as valid. First, what Walsh believed during the bidding process or, rather, what it now says it believed at that time, is

wholly irrelevant. The undeniable facts are that Walsh knew it was required to submit a signed page D-25, it did not do so, and its failure to do so left it unbound to its bid, affording it a substantial advantage over Paschen and the other bidders. See *Kennedy*, 135 Ill. App. 3d at 314 ("absent compliance with *** contractual requirements, [bidder's] intentions are simply immaterial"). So too is it irrelevant that Walsh did not actually realize any advantage by breaching its offer; it still had the ability to exercise this advantage if it later desired. See *Bodine*, 305 Ill. App. 3d at 439.

Second, Walsh's contention that the existence of its signature on page P-8X bound it to its bid is without merit. Page P-8X was part of the Proposal, not part of the mandated Utilization Plan required to be signed by all bidders. The project's focus here was the use of minority and small businesses in relation to the District's affirmative action plan. Signing page D-25 of the Utilization Plan provided the operative signature to bind the bidders to the terms and conditions regarding this focus and to commit to them. Signing page P-8X was not an adequate substitute. While page D-25 sought the assurance that the bidders would bind themselves to the Utilization Plan and the subcontractors they named therein, page P-8X sought a different assurance—that the bidders would not cancel or withdraw their bids. Nothing on page P-8X, nor anywhere in the Proposal for that matter, addresses the bidders' commitment to be bound to a Utilization Plan or certain subcontractors. Simply put, because Walsh did not submit a signed page D-25, it was not bound to the terms of the Utilization Plan; accordingly, Walsh enjoyed an advantageous position over Paschen and the other bidder due to this material variance and its bid was properly rejected as nonresponsive.

Walsh relies heavily on *Kokosing Construction Co. v. Dixon*, 72 Ohio App. 3d 320, 594 N.E.2d 675 (1991), a cause wherein a court ordered a public entity to accept a nonconforming bid. In *Kokosing*, the city of Dayton, Ohio, advertised an invitation to bid on improvements at a water treatment facility. Requirements for a proper bid included that it be below the engineer's estimate and that it contain a signed affirmative action statement regarding the bidder's employees. Kokosing Construction Company and Shook, Inc., both submitted bids for the project. Shook's bid was below the estimate for the project but, while Shook included the affirmative action statement, it forgot to sign it. Kokosing, meanwhile, submitted a bid higher than the estimate, but had included and signed the statement. The city eventually rejected both bids in an effort to save money, and Kokosing filed a motion for temporary restraining order and preliminary and permanent injunction asking the trial court to order the city to award it the

contract. Shook, too, filed a complaint alleging it had submitted the lowest responsive bid and asking the trial court to order the city to award it the contract. The trial court ordered the city to award the contract to Shook, finding that its failure to sign the statement was only a "clerical error that did not render the bid nonresponsive." *Kokosing*, 72 Ohio App. 3d at 325, 594 N.E.2d at 678.

On appeal, the *Kokosing* court began by stating that under Ohio law, public contracts are awarded according to the "lowest and best bid," and the issue was whether the city's failure to award the contract to Kokosing constituted an abuse of discretion under that standard. See *Kokosing*, 72 Ohio App. 3d at 325, 594 N.E.2d at 678. The *Kokosing* court found that it was not. First, the court noted that one of the advertised requirements for a proper bid was that it not exceed the engineer's estimate on the project. See *Kokosing*, 72 Ohio App. 3d at 326-27, 594 N.E.2d at 679. Kokosing knew this, but submitted a bid higher than this estimate. The court concluded that because of this, the city's rejection did not constitute an abuse of discretion. See *Kokosing*, 72 Ohio App. 3d at 327, 594 N.E.2d at 679. Second, the *Kokosing* court found that the trial court had not abused its discretion in concluding that Shook's variance of failing to sign the affirmative action statement was immaterial. See *Kokosing*, 72 Ohio App. 3d at 329, 594 N.E.2d at 680-81. The court noted specifically that this was not a case of a bidder failing to supply the statement; rather, Shook complied with all material parts of the statement by filling it out and including it with its bid, but simply forgot to sign it at the bottom. See *Kokosing*, 72 Ohio App. 3d at 329, 594 N.E.2d at 680-81. According to the *Kokosing* court, this did not place Shook at an advantage but was only a clerical error that did not render its bid nonresponsive. See *Kokosing*, 72 Ohio App. 3d at 329, 594 N.E.2d at 680-81.

While the facts of *Kokosing* are somewhat superficially similar to the instant cause, that case is distinguishable on several grounds. *Kokosing* originated in an Ohio court, where the law of the state regarding the award of public contracts follows a different standard than that in Illinois. That is, while Ohio follows its own principles applicable to the "lowest and best bid," we have already discussed that the District here was required to follow its own Ordinance under Illinois law, which discusses the "lowest responsible bid." Compare *Kokosing*, 72 Ohio App. 3d at 325, 594 N.E.2d at 678, with 70 ILCS 2605/ 11.3, 11.17 (West 2006). Thus, a comparison of these cases is inappropriate. Moreover, upon closer examination, the comments of the *Kokosing* court are actually in line with our decision here. Just as Kokosing, Walsh knew that submitting a signed page D-25 was a requirement for a responsive bid; it was repeatedly advertised in the

District's invitation to bid and made known at the mandatory pre-bid meeting. So, just as Kokosing who was not awarded the contract by the court, Walsh failed to follow the bid requirements. In addition, Walsh's situation is not like Shook's where it simply did not sign an otherwise completed page of the contract it had included in its bid. Instead, as the *Kokosing* court distinguished, Walsh did not submit page D-25 at all; there was no information on minority subcontractors that was required as part of the bid. Thus, unlike Shook who was awarded the contract, Walsh's bid was nonresponsive.

If, despite the clear holdings of *Michuda*, *Bodine* and *Kennedy*, Walsh still insists on citing to legal precedent outside our state level, we would direct it to the case of *Rossetti Contracting Co. v. Brennan*, 508 F.2d 1039 (7th Cir. 1975). There, Rossetti was the lowest bidder on a federally assisted construction contract; however, it failed to comply with the requirements of the invitation to bid when it did not submit with its bid a required "Appendix A," which contained a commitment by the bidder to hire minority workers on the project. The bid was found to be nonresponsive, and the contract was to be awarded to the next lowest bidder. Rossetti brought suit, and the United States District Court for the Northern District of Illinois found that the variance in Rossetti's bid was minor and it should have received the contract. See *Rossetti*, 508 F.2d at 1042. On appeal, however, the United States Court of Appeals for the Seventh Circuit reversed. First, the *Rossetti* court found that the language in the invitation to bid made clear that the submission of Appendix A was a requirement related to reponsiveness. See *Rossetti*, 508 F.2d at 1043-44. The *Rossetti* court also found that the failure to include it in the submission of the bid was not minor but material because it permitted Rossetti to walk away from the contract if it later desired. See *Rossetti*, 508 F.2d at 1044-45. Such situations, concluded the *Rossetti* court, would result in an impairment of the operation of the sealed competitive bidding system. See *Rossetti*, 508 F.2d at 1045.

Therefore, based on the record before us, it is our conclusion here that the District and, in turn, the trial court were correct not to classify Walsh's variance of failing to submit a signed page D-25 with its bid as immaterial but, rather, as a material variance that rendered Walsh's bid nonresponsive for the project at issue. To hold otherwise could, with all due certainty, negatively affect the competitive bidding process by resulting in protracted litigation about issues such as good faith, intent and inadvertence. Our legislature armed public bodies such as the District here with discretionary authority to award public contracts. Judicial interference with this, to any extent beyond that here, is unwarranted.

157

## CONCLUSION

Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD and TOOMIN, JJ., concur.