Filed 3/23/10     NO. 4-09-0450

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| BRAD BARNES, | ) | Appeal from |
|       Plaintiff-Appellant, | ) | Circuit Court of |
|       v. | ) | Macoupin County |
| ROSE MICHALSKI, | ) | No. 07LM22 |
|       Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Lois A. Bell, |
| | ) | Judge Presiding. |

_____

JUSTICE APPLETON delivered the opinion of the court:

Plaintiff, John B. Barnes, brought this action against defendant, Rose Michalski, to enforce the repayment of a loan. (The caption identifies plaintiff as "Brad Barnes," but we will use his full formal name, which we have obtained from the transcript of the trial.) At the close of plaintiff's evidence in the bench trial, the trial court granted defendant's motion for a judgment in her favor. See 735 ILCS 5/2-1110 (West 2008). Plaintiff appeals, and we conclude that the judgment is against the manifest weight of the evidence.

It is undisputed that plaintiff advanced defendant $27,000 and that, when doing so, he did not owe her $27,000. Further, she was neither his spouse nor his relative. Those facts created the presumption of a loan. Defendant had the burden of rebutting that presumption by going forward with clear and convincing evidence that the $27,000 was a gift, as she pleaded in her answer. Instead of requiring defendant to carry that burden of production, the court prematurely ended the trial at the conclusion of plaintiff's case, by

granting defendant's motion for a judgment in her favor. Therefore, we reverse the trial court's judgment and remand this case with directions to resume the trial and proceed to its conclusion.

## I. BACKGROUND

### A. The Complaint and Answer

In his complaint, which he filed on February 15, 2007, plaintiff alleges he has lent defendant a total of $27,000 as evidenced by two cashier's checks, copies of which are attached to his complaint as exhibits A and B, and that she has not repaid him. In her answer, defendant denies that allegation.

The answer admits, however, paragraphs 4 and 5 of the complaint, which read as follows:

"4. On or about November 24, 2003[,] [p]laintiff delivered to [d]efendant *** a check in the amount of $25,000.00 drawn on the First National Bank, Girard, Illinois. See [e]xhibit 'A'.

5. On or about December 18, 2003[,] [p]laintiff delivered to [d]efendant *** a check in the amount of $2,000.00 drawn on the First National Bank, Girard, Illinois. See [e]xhibit 'B'."

Although defendant admits receiving these two cashier's checks from plaintiff, she denies they are loans. Rather, she asserts in her answer that they are gifts. In response to the allegation, in paragraph 7 of the complaint, that she "has not repaid said sums to [p]laintiff," defendant "denies that she has any obligation to repay the gifts

provided by the [p]laintiff."

## B. The Bench Trial

### 1. Admission of the Cashier's Checks

The bench trial commenced on May 22, 2009, and at the beginning of the trial, before calling any witnesses, plaintiff's attorney offered in evidence plaintiff's exhibit Nos. 1 and 2, which were the cashier's checks referenced as exhibits A and B in paragraphs 4 and 5 of the complaint. Defendant's attorney had no objection to plaintiff's exhibit Nos. 1 and 2, and the trial court admitted them in evidence.

These two exhibits are in the common-law record. Plaintiff's exhibit No. 1 is a cashier's check in the amount of $25,000. It is dated November 24, 2003. Plaintiff's name, Brad Barnes, is typed on the line corresponding to the "remitter" and also on the line corresponding to the words "pay to the order of." He has endorsed the check on its reverse side, and under his signature are the words "Pay to the Order of Rose Michalski." Below that restrictive endorsement is the signature of "Rose Michalski," followed by the ink stamps and dot-matrix notations of several financial institutions.

Plaintiff's exhibit No. 2 is a copy of another cashier's check, which, in its endorsements and notations, closely resembles plaintiff's exhibit No. 1 except that this check is dated December 18, 2003, and is in the amount of $2,000. Again, the remitter is plaintiff, and on its front side, the check is payable to his order. He has endorsed the reverse side of the check, above the words "Pay to the Order of Rose Michalski," and the signature of "Rose Michalski" appears under that restrictive endorsement, followed by the notations of various financial institutions.

- 3 -

## 2. The Testimony at Trial

Three witnesses testified in plaintiff's case in chief: plaintiff; his wife, Barbara Dell-Barnes; and defendant, whom he called as a hostile witness. Here is the gist of their testimony.

Plaintiff testified that he had been married to Dell-Barnes for 13 years and that they lived in Girard. In the summer of 1999, plaintiff became acquainted with defendant, who at that time was married to George Michalski. The Michalskis also lived in Girard. Plaintiff got to know the Michalskis because both he and George Michalski were volunteer firefighters in the Girard fire department and the families of firefighters often went on outings together to Otter Lake, where they had parties and went boating and canoeing.

Thus, the Barneses had a social relationship with the Michalskis through the fire department, but the Barneses and defendant developed a further bond because of the Barneses' self-described practice of being "swingers." Plaintiff's attorney asked plaintiff:

"Q. Now, you and your wife practice a certain lifestyle?

A. Yes, we do.

Q. And what do you call that?

A. That is[,] basically[,] we are in a lifestyle[--]we are swingers[,] and we basically go out and meet other couples and--

Q. In other relationships?

A. Yes.

Q. Did Rose ever participate in those activities with you?

A. Yes, she did.

[Q.] And where would those occur at?

A. Happened at different places. Couple of times at her house, couple of times at a hotel in Springfield, couple of times out at the lake a lot.

Q. And was your wife present during any of these?

A. Yes, she was.

Q. And was she aware of those activities?

A. Oh, yes. Yes."

Sometimes, in these casual gatherings, defendant told plaintiff about her financial troubles. She had maxed out her credit cards and was having difficulty making house payments. She was afraid that she and her husband would lose their home. Several months after she first brought up her money problems, plaintiff sat down with her, and they went through her bills, brainstorming for solutions. George Michalski did not participate in this conversation; defendant was afraid that if he found out how badly off they were financially, he would say he did not want the house anymore because they were living beyond their means. The interest and fees on the credit cards were eating them up. Plaintiff and defendant tried to get the credit-card balances moved to a different credit-card company, one that would charge a lower rate of interest, but they were unsuccessful. Finally, plaintiff and defendant "figured out about what she was in debtwise, that would help her get on top of her bills." The sum she needed appeared to be $25,000. So, in

November 2003, plaintiff withdrew $25,000 from his 401K plan and gave defendant a cashier's check in that amount (plaintiff's exhibit No. 1).

Plaintiff testified:

"A. Basically, I told her[,] ['U]se this money to get on top of your bills. Once you get on top of your bills[,] all the money that you were paying to your credit cards, all the service charges, all that[,] you can start then giving that back to me.['] I mean[,] she was paying outlandish fees. And I said[,] ['W]henever you get on top of it[,] pay me back[']. No, I didn't want anything extra back. I just said[,] ['P]ay me back.[']

Q. To your knowledge, did her husband know what was going on?

A. No.

Q. Did your wife know?

A. Yes."

Thus, according to plaintiff's testimony, his wife knew "what was going on"-- meaning, apparently, not only the infusion of $25,000 from plaintiff's retirement account into the Michalskis' bank account but also, more generally, his relationship with defendant--but defendant's husband was in the dark. In his efforts to financially assist the Michalski household, plaintiff dealt exclusively with defendant. A couple of weeks after giving her the cashier's check in the amount of $25,000, he asked her how she was doing. She replied that she had overlooked a couple of bills and that she needed more money. He

asked her how much more money, and she answered that she needed a couple thousand dollars more. He told her, "['W]ell, okay. *** I will get another check for you[,] but that's pretty much it. The well is dry. I don't have, you know, any more to give you ***.[']" So, in December 2003, he obtained a second cashier's check (plaintiff's exhibit No. 2), this one in the amount of $2,000, and delivered it to her.

About two years after endorsing over to defendant these two cashier's checks, plaintiff began reminding her of his expectation that she pay him back, and he was prompted to do so by a conversation he had one day with her son, at the fire department. Plaintiff testified:

"A. I was at the firehouse[,] and [defendant's] son was there with her car[,] and I made the comment to him[,] *** ['Y]ou need to be careful with Mama Rose's car[.] [P]ut a scratch on it[,] [and] she is going to kick your butt.['] He said, ['W]ell, this is going to be my car.['] [']Why is that?['] [']Well,['] he said, ['M]om is getting ready to buy a new car[,] and I get this one.['] Well, I thought if she is able to buy another car[,] she should have been trying to pay me something back a little bit at a time.

Q. Do you know how long that was after you had given her the money?

A. Yeah, that was a couple of years later. A year or so later[,] that's when I seen him."

After this conversation with defendant's son, plaintiff gave defendant a call and told her, "'[H]ear you are wanting to buy a car. You know you need to start paying me back[']***." She replied, "['Y]eah, I will see what I can do.[']"

A further period of time went by, and plaintiff brought up the matter of repayment again. Defendant asked him how much she owed him. He reminded her he had given her two cashier's checks, one for $25,000 and the other for $2,000. She requested to see copies of the cashier's checks, and he told her he would obtain them from the bank. After sending her copies of the cashier's checks, he received a letter from defendant asserting that she owed him nothing because the $27,000 was a gift.

On cross-examination, plaintiff again acknowledged that defendant's then-husband, George Michalski, had known nothing about his provision of $27,000 to defendant. (The Michalskis divorced in 2008.) Nor did George Michalski know about the "swingers thing"; it was strictly between the Barneses and defendant.

Plaintiff further admitted, on cross-examination, that for a period of several years, he talked with defendant almost daily on the cell phone. He also accompanied her on a trip to Chicago and stayed in a hotel room with her. Additionally, the Barneses bought her jewelry for Christmas and sent her flowers. Plaintiff agreed that he and defendant were close.

Because of his close relationship with defendant, he wanted to help her, and she confided in him. When sitting down with her to help her organize her finances, plaintiff knew she earned only $40,000 a year and that $27,000 was more than half her yearly earnings. He knew it would take her longer than a year to pay him back. Every once

in a while--at the lake, for instance--plaintiff and his wife suggested to defendant that she should begin whittling down her indebtedness to them. Even a small payment would have demonstrated that she was at least trying to pay them back.

Although the Barneses expected repayment, plaintiff admitted that no writing existed calling the advancement of $27,000 a loan. Plaintiff never wrote "loan" on the cashier's checks. Defendant's attorney asked him:

"Q. *** And so, how did it come about that you gave her that [$25,000] check? I mean, did you say, [']I will give you $25,000 if you pay me back within 10 years, if you pay me $400 a month[']? What did you say to her?

A. We didn't set up any terms, no. I did not say, ['O]kay, I will give you this[,] and here [are] the terms for paying it back.['] Basically[,] I said, ['O]kay, this is what you need. Let me see what I can do.[']"

Plaintiff further admitted he never "put a time limit" on her repayment. Eventually, there came a time, however, when her continued failure to repay any amount whatsoever no longer was acceptable to him.

Plaintiff recalled that on December 26, 2006, he left a message on defendant's answering machine, asking for the money. In January 2007, she responded with a letter, defendant's exhibit No. 1 (not admitted in evidence, though used in the trial), in which she stated she was shocked that he was asking for the money back. According to plaintiff, December 2006 was not the first time he urged her to begin repayment. They "had talked

about it a couple of times" before then.

Judging, however, from the tenor of the cross-examination, defendant's theory was that plaintiff had given her the $27,000 as a gift because he was infatuated with her and that later, when the passion cooled, he began having second thoughts about the gift and he started insisting on repayment. Defendant's attorney asked plaintiff:

"Q. Now, you know that Rose has claimed that this was an affair that went on for years, a love affair between the two of you?

A. That's correct.

Q. And you deny that?

A. I do."

On redirect examination, plaintiff testified that before her letter of January 9, 2007, defendant never signified to him, in any way, that she considered the $27,000 to be a gift.

Plaintiff next called Barbara Dell-Barnes. She testified she had been married to plaintiff for 13 years. She had been aware of plaintiff's plan to provide defendant $25,000. She testified that she and her husband were "swingers" and they sometimes "swung" in hotels in Springfield. Defendant "participate[d] in that area."

Plaintiff called defendant as his final witness. She admitted receiving the two cashier's checks from plaintiff and using them to pay off her debts. She was married to George Michalski at the time plaintiff endorsed the checks over to her, and she denied ever telling George Michalski that she had borrowed money from plaintiff.

In response to that denial, plaintiff's attorney impeached defendant with testimony she had given in her deposition on June 3, 2008. In her deposition, defendant testified:

"[']George found out on January 3rd of 2007 because Brad told me he wanted the money. So, I wanted to get copies of those checks from Brad. So, that's the day that Brad gave me those checks is the night I went home and I told my husband[.] I said[,] ["]I have got something to tell you.["] I said back in 2003[,] I <u>borrowed</u> <u>money</u> from Brad Barnes[,] and I said we had intentions of getting divorced and we were going to get married.[']" (Emphasis added.)

Later on in her deposition, however, defendant corrected herself and characterized the money as a gift rather than as "borrowed."

Plaintiff then rested, whereupon defendant moved for a "directed verdict" on the ground that the alleged oral contract was not to be performed within one year and therefore was barred by the statute of frauds. See 740 ILCS 80/1 (West 2002). Defendant cited plaintiff's own testimony that he did not plan to be paid back within a year. Plaintiff responded that the transaction was outside the statute of frauds because "checks were given, the money was delivered[,] [and] the contract was completed at that point." Plaintiff further pointed out that since defendant was alleging a gift, she had the burden of proving a gift by clear and convincing evidence. Defendant disagreed that she had to prove anything or that any burden shifted to her; she maintained that because plaintiff was

alleging a breach of contract, he had to prove "offer, acceptance[,] and terms."

The trial court granted defendant's motion for a judgment, not because of the statute of frauds but because, in the court's opinion, plaintiff had failed to prove the elements of his prima facie case. The court explained:

"Plaintiff alleges in his [c]omplaint that he made a loan to [d]efendant. A loan[,] in this [c]ourt's view[,] is a contract. You can call it what you want[,] but a contract is a contract. There has to be offer, there has to be acceptance and terms of repayment. All of which is the burden of [p]laintiff to prove. If he proves that, then I think the burden would then shift over to [d]efendant to prove that it was not a loan[/]contract but, in fact, it was a gift[;] that would be her burden. But I don't find[,] on the direct testimony of [p]laintiff and his supporting witness[,] that he has met his burden with respect to the contract. So, Attorney Reed[']s motion for directed verdict [sic] will be granted. I will do a short order to that effect. Thank you, folks."

The order, which the trial court entered on May 22, 2009, reads as follows: "Matter coming on for bench trial, both parties present with attorneys. Plaintiff presents evidence. Defendant moves for directed verdict at the close of plaintiff's evidence. Directed verdict. Cause dismissed."

This appeal followed.

- 12 -

## II. ANALYSIS

### A. The Standard of Review

In his brief, plaintiff discusses the standard of review applicable to a case in which the trial court granted a motion for a directed verdict. That discussion is a false start. It is true that, at the close of plaintiff's evidence, defendant's attorney moved for a "directed verdict" and the trial court purported to direct a verdict. Nevertheless, a directed verdict was impossible because the trial was a bench trial rather than a jury trial. See Seldin v. Babendir, 325 Ill. App. 3d 1058, 1062, 759 N.E.2d 28, 32 (2001); 735 ILCS 5/2-1202(a) (West 2008); 134 Ill. 2d R. 240. Defendant really was moving for a judgment in her favor at the close of plaintiff's case, pursuant to section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2008)).

By pointing out this distinction, we are not merely quibbling over nomenclature. It is important to keep in mind the difference between a motion for a directed verdict in a jury trial and a motion for a finding in the defendant's favor at the close of the plaintiff's case in a bench trial, because those motions raise different questions and require different analyses. When a party moves for a directed verdict in a jury trial, the trial court views all the evidence in an aspect most favorable to the opponent and grants the motion only if the evidence so overwhelmingly favors the movant that a verdict in the opponent's favor could never stand. Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). Because we review directed verdicts de novo, we perform the same analysis as the trial court: we ask whether all the evidence, viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary

verdict could ever stand.  Friedman v. Safe Security Services, Inc., 328 Ill. App. 3d 37, 47, 765 N.E.2d 104, 113 (2002). Viewing the evidence in a light most favorable to the opponent is a way to avoid intruding upon the province of the jury; we thereby allow the jury an opportunity to regard the evidence in a light most favorable to the opponent, if it chooses to do so.  "Unquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony." Maple v. Gustafson, 151 Ill. 2d 445, 452, 603 N.E.2d 508, 511-12 (1992).

In a bench trial, however, the trial court, rather than a jury, is the trier of fact, and when granting a motion pursuant to section 2-1110 (735 ILCS 5/2-1110 (West 2008)) for a judgment in the defendant's favor at the close of the plaintiff's case, the court might well resolve conflicts in the evidence and assess the credibility of witnesses, depending on the reason why the court grants the motion.  If the court grants the defendant's motion for a judgment at the conclusion of the plaintiff's case, the court will do so for either of two reasons:  (1) the plaintiff failed to present at least some evidence on each element of the prima facie case, or (2) the plaintiff failed to carry the ultimate burden of proof. In re Estate of Etherton, 284 Ill. App. 3d 64, 68, 671 N.E.2d 364, 367 (1996).  The supreme court has explained:

"The prima facie case standard ordinarily applies to both jury and nonjury cases.  In any case in which the plaintiff has failed to make out a prima facie case, i.e., he has not presented at least some evidence on every element essential to

- 14 -

his cause of action, the defendant is entitled to judgment in his favor as a matter of law. When a defendant, as here, moves for judgment under section 64(3), the trial judge must first determine, as a legal matter, whether the plaintiff has made out a prima facie case. If he has not, the court should, without more, grant the motion and enter judgment in the defendant's favor.

If, however, the plaintiff has made out a prima facie case, the trial judge, in his role as the finder of fact, must then weigh the plaintiff's evidence as aforesaid. This weighing process may result in the negation of some of the evidence necessary to the plaintiff's prima facie case, in which event the court should grant the defendant's motion and enter judgment in his favor. On the other hand, if sufficient evidence necessary to establish the plaintiff's prima facie case remains following the weighing process, the court should deny the defendant's motion and proceed as if the motion had not been made." Kokinis v. Kotrich, 81 Ill. 2d 151, 154-55, 407 N.E.2d 43, 45 (1980).

Thus, if the defendant moves for judgment at the close of the plaintiff's evidence in a bench trial, the trial court must perform an analysis consisting of two phases. In the first phase, the court does not weigh the evidence as of yet but merely considers

whether the plaintiff has adduced at least some evidence in support of each element of the prima facie case. In other words, the court determines, as a matter of law, whether the plaintiff has presented at least some evidence on every element of the cause of action. Walsh/II in One Joint Venture III v. Metropolitan Water Reclamation District of Greater Chicago, 389 Ill. App. 3d 138, 145, 904 N.E.2d 1158, 1165 (2009); Baker v. Jewel Food Stores, Inc., 355 Ill. App. 3d 62, 66, 823 N.E.2d 93, 99 (2005); Denis F. McKenna Co. v. Smith, 302 Ill. App. 3d 28, 31, 704 N.E.2d 826, 829 (1998). If the plaintiff has failed to make out a prima facie case, the court should grant the defendant's motion. If the plaintiff has made out a prima facie case (by presenting at least some evidence on each element), the court then should proceed to the second phase of the analysis, in which the court weighs all the evidence. Walsh/II, 389 Ill. App. 3d at 145, 904 N.E.2d at 1165; Baker, 355 Ill. App. 3d at 66, 823 N.E.2d at 99.

The second phase recognizes that even though the plaintiff has presented some evidence on every element of the cause of action, the trial court, as the weigher of evidence, might not necessarily find the evidence as to one or more of the elements to be convincing enough to qualify as proof by a preponderance of the evidence (or by whatever standard of proof applies to the matter). If the court already knows, at the close of the plaintiff's case, that it will not find in the plaintiff's favor on the basis of the evidence the plaintiff has presented, because the quality and credibility of the evidence, in the court's view, fail to satisfy the ultimate burden of proof, there is no point in going on. Walsh/II, 389 Ill. App. 3d at 145-46, 904 N.E.2d at 1165; Baker, 355 Ill. App. 3d at 66-67, 823 N.E.2d at 99. If the plaintiff's evidence is unconvincing as it stands, even without the presentation

of any evidence by the defendant, the court should grant the defendant's motion for judgment. On the other hand, if the weighing process does not negate any element of the prima facie case, the court should deny the defendant's motion and continue with the trial.

If the trial court terminates the bench trial by granting the defendant's motion for judgment at the close of the plaintiff's evidence, our standard of review will depend on the reason why the court granted the motion, i.e., the phase in which the court granted the motion, the first phase or the second phase. If the court granted the motion in the first phase of its analysis, finding a total lack of evidence on one or more of the elements of the prima facie case, our standard of review is de novo (Minch v. George, 395 Ill. App. 3d 390, 397, 917 N.E.2d 1169, 1177 (2009); Walsh/II, 389 Ill. App. 3d at 145, 904 N.E.2d at 1165; Baker, 355 Ill. App. 3d at 66, 823 N.E.2d at 99); for the trial court was in no better position than we are to determine the mere presence or absence of evidence. See Kokinis, 81 Ill. 2d at 155, 407 N.E.2d at 45 ("the trial judge must first determine, as a legal matter, whether the plaintiff has made out a prima facie case"); Woods v. Cole, 181 Ill. 2d 512, 516, 693 N.E.2d 333, 335 (1998) (a reviewing court reviews questions of law de novo).

If, however, the trial court granted the motion in the second phase of the analysis, by weighing the evidence and assessing the credibility of witnesses, we ask whether the ruling is against the manifest weight of the evidence. Kokinis, 81 Ill. 2d at 154, 407 N.E.2d at 45; Walsh/II, 389 Ill. App. 3d at 146, 904 N.E.2d at 1165; Baker, 355 Ill. App. 3d at 67, 823 N.E.2d at 99. The ruling is against the manifest weight of the evidence only if it is unreasonable, arbitrary, or not based on any evidence or only if the opposite conclusion is clearly evident from the evidence in the record. In re Estate of Savio, 388 Ill.

App. 3d 242, 247, 902 N.E.2d 1113, 1118 (2009).

Thus, in order to know which standard of review to apply--whether to review the decision <u>de novo</u> or to ask whether the decision is against the manifest weight of the evidence--we have to determine in which phase of the two-part analysis the trial court granted defendant's motion for judgment at the close of plaintiff's case.  In granting defendant's motion in this case, the court remarked:

> "A loan[,] in this [c]ourt's view[,] is a contract.  *** There has to be [an] offer, *** acceptance[,] and terms of repayment[,] [a]ll of which [it] is the burden of [p]laintiff to prove.  If he proves that, then I think the burden would then shift over to [d]efendant to prove that it was not a loan[/]contract but, in fact, it was a gift[;] that would be her burden.  But I don't find[,] on the direct testimony of [p]laintiff and his supporting witness[,] that he has met his burden with respect to the contract."

When the court found that plaintiff had not "met his burden with respect to the contract," the court evidently meant the ultimate burden of proof to which it referred earlier ("[it] is the burden of [p]laintiff to prove").  Because the court found that plaintiff had failed to carry his ultimate burden of proof, as distinct from his burden of initially going forward with some evidence in support of each element of his <u>prima facie</u> case, we infer that the court granted defendant's motion on the basis of its weighing of the evidence, not because of a failure on plaintiff's part to present any evidence at all on one or more of the elements

of the cause of action. In re Custody of Anderson, 145 Ill. App. 3d 746, 750, 496 N.E.2d 345, 348 (1986) (discussing the "burden of going forward" versus the "burden of proof"); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §301.4, at 90-92 (9th ed. 2009) (discussing the "burden of production" versus the "burden of persuasion"). Therefore, to the extent that we scrutinize this weighing of the evidence, we ask whether the court's decision is against the manifest weight of the evidence--a deferential standard of review.

## B. The Terms of Repayment

Even though we apply a deferential standard of review to the trial court's weighing of the evidence, some of the issues on appeal might have nothing to do with the weighing of evidence. For example, the parties in this appeal disagree on whether plaintiff had to prove specific and definite terms of repayment. The law determines the elements of a cause of action, or what plaintiff has to prove, and we decide legal issues de novo (Lowe Excavating Co. v. International Union of Operating Engineers Local No. 150, 327 Ill. App. 3d 711, 720, 765 N.E.2d 21, 30 (2002)). Plaintiff maintains that by his testimony, he proved what the law required him to prove with respect to the terms of repayment, even though those terms were general. He testified he told defendant to begin paying him back, in installments, when she got on top of her bills. Defendant argues, on the other hand, that plaintiff had to prove the "specific and definite terms of the alleged loan" and that because he admitted, on cross-examination, that he and defendant "hadn't set up any terms," we should affirm the judgment in her favor.

The parties do not explain what they mean by the "terms of repayment," and the trial court did not explain what it meant by that expression, either; but it is easy to

think of some potential terms of repayment in a loan transaction, e.g., when the loan is due, whether it must be paid in a lump sum or may be paid in installments, where payment shall be made, how payment shall be made (whether by hand delivery, mail, or electronic transfer), the medium of payment (such as cash, personal check, cashier's check, or money order), late penalties, and interest. No doubt that list does not exhaust the possibilities, and it is unclear how many of these terms of repayment, or which ones, the trial court and defendant consider to be mandatory.

Rather than take up the question of whether plaintiff proved enough terms of repayment or whether he proved them with sufficient specificity and definiteness, we choose to proceed directly to a more germane question: whether plaintiff had to prove any terms of repayment at all. The trial court held that plaintiff had to prove the terms of repayment as an element of his prima facie case, just as he had to prove an offer and an acceptance. That holding seems counterintuitive because it would allow a borrower to walk away, free of obligation, even if the borrower had accepted money on the understanding that it was a loan. Suppose, for instance, that A hands his friend B $27,000, telling him, "I know, B, that you have been going through hard times financially. Please allow me to help by lending you this money." B accepts the money and thanks A profusely. Suppose, further, that three or four years go by and B has not repaid one cent of the $27,000. A requests B to begin repaying the loan, but B refuses to do so. Therefore, A sues B. At trial, A will be unable to prove any terms of repayment, because A and B agreed on no terms of repayment. That A consequently forfeits the $27,000, or that B has no obligation to repay it, strikes us as an implausible account of the law, considering that when B accepted the

money as a loan, he apparently had no objection to indefinite terms of repayment.

Surprisingly, though, Illinois case law offers little guidance on the enforceability of loans made without agreement as to the terms of repayment. This sparsity of relevant Illinois decisions is surprising because common experience suggests that people lend each other money all the time in informal word-of-mouth transactions, in which the terms of repayment are either vague or unexpressed, and often they fail to pay back these loans. One might have thought that, now and then, these lenders would seek a judicial remedy. In our research of Illinois case law, however, we have found only a couple of suggestive pronouncements, one from the First District and the other from the Third District. In Chapin v. Tampoorlos, 325 Ill. App. 219, 223, 59 N.E.2d 334, 335 (1945), the First District says: "A loan of money has been defined as an advancement of money upon a contract or stipulation, express or implied, to repay it at some future day." If, as the First District says, the stipulation to repay the money need not be express but may be implied, it would seem to follow that the lender need not prove specific and definite terms of repayment, contrary to defendant's argument in this appeal. The lender merely has to prove that the advancement of money was a loan, for the stipulation of repayment was already implied in the word "loan." Doughty v. Sullivan, 661 A.2d 1112, 1123 (Me. 1995). Similarly, in Swift & Co. v. Dollahan, 2 Ill. App. 2d 574, 588, 120 N.E.2d 249, 256 (1954), the Third District says: "The promise implied at common law to repay money loaned was limited to repayment of principal [citation]." If, according to the Third District, the common law implies a promise to repay a loan, the lender's right of recovery apparently does not depend on the lender's ability to prove the terms of repayment.

Because of the scarcity of relevant Illinois case law, we have consulted legal treatises as well as decisions from other states, and we find abundant confirmation that, contrary to the trial court's holding in this case, the common law does not require the plaintiff to prove the "terms of repayment" to obtain a judgment for repayment of a loan. If the loan contract omits the terms of repayment, the court will supply them. Woods v. Hobson, 980 S.W.2d 614, 617 (Mo. App. 1998); Restatement (Second) of Contracts §204 at 96-97 (1981). All the cases we have found agree that the parties' failure to stipulate the time for repayment of a loan does not vitiate the loan or excuse the recipient of the money from having to pay it back. Rather, absent such a stipulation by the parties, courts take either of two views on the time for repayment. According to one view, if the parties did not specify any time for repayment, the loan is payable on demand. Doughty, 661 A.2d at 1123; Minevitch v. Puleo, 9 A.D.2d 285, 288, 193 N.Y.S.2d 833, 836 (1959); Colburn v. First Baptist Society of Monroe, 60 Mich. 198, 200, 26 N.W. 878, 879 (1886). According to the other view--apparently the majority view--if the parties did not specify any time for repayment, the loan must be repaid within a reasonable time. Helms v. Prikopa, 51 N.C. App. 50, 56, 275 S.E.2d 516, 519 (1981); Hook v. Crary, 142 N.W.2d 140, 145 (N.D. 1966); McDonald v. Hanahan, 328 Mass. 539, 541-42, 105 N.E.2d 240, 242 (1952); Miller v. Nudd, 149 Wash. 419, 422, 271 P. 80, 81 (1928); Restatement (Second) of Contracts §204, Comment d, at 97-99 (1981); 13 R. Lord, Williston on Contracts §38:22, at 474-76 (4th ed. 2000).

In the present case, we need not decide which of those two views is correct, because, at trial, plaintiff went ahead and offered some evidence of the terms of repayment:

he testified he told defendant she could begin paying him back when she got on top of her debts. Therefore, by plaintiff's own understanding, the alleged loan was payable not on demand but within a reasonable time, and he admitted the repayment was to be in installments and without interest. See McDonald, 328 Mass. at 541-42, 105 N.E.2d at 242 ("there is the statement, 'payments arrangements to follow at later date.' This means that the defendant promises to repay the loan, very likely in instalments, but that the precise details are left to be worked out in the future. This would mean within a reasonable time").

In any event, our point is that, contrary to the trial court's assumption, plaintiff did not have to prove any terms of repayment as part of his prima facie case. Even if the parties never agreed on the terms of repayment, a court will supply the terms of repayment if there was a loan. See Restatement (Second) of Contracts §204, at 97-98 (1981). Given the trial court's remarks at the conclusion of the bench trial, it is possible that the court granted defendant's motion for judgment at the close of plaintiff's case because plaintiff had failed to carry his "burden of proving" "the terms of repayment"--which actually, under a correct view of the law, he did not have to prove at all. He merely had to prove it was an unpaid loan. See 66 Am. Jur. 2d Restitution & Implied Contracts §171, at 748 (2001); Doughty, 661 A.2d at 1123; Cartney v. Olson, 154 Neb. 546, 550, 48 N.W.2d 653, 656 (1951); Siebrecht v. Siebrecht, 153 A.D. 227, 228-29, 137 N.Y.S. 1073, 1074 (1912).

C. The Presumption of a Loan

Because the trial court remarked that if plaintiff had carried his burden of proof, the burden then would have shifted to defendant to prove that the $27,000 was a gift, the court, as the trier of fact, must not have considered the evidence to be sufficient,

as of yet, to prove a gift. Indeed, when we review the transcript of the trial, all we find, in support of the theory of a gift, is defendant's bare assertion that the money was a gift. We are aware that, in her brief, defendant quotes the letter she wrote to plaintiff on January 9, 2007, and that in this letter, she claims he originally told her she never had to pay him back. Nevertheless, although defendant's attorney used this letter (defendant's exhibit No. 2) in his cross-examination of plaintiff, it does not appear that the letter ever was admitted in evidence at trial. Of course, one does not need the letter to perceive the close relationship that plaintiff used to have with defendant. The law, however, does not presume a gift if someone transfers property to a friend, even a close friend. The law presumes a gift if someone transfers property to his or her spouse or family member (Grandon v. Amcore Trust Co., 225 Ill. App. 3d 630, 634, 588 N.E.2d 311, 315 (1992)) but not if someone transfers property to a friend. Because defendant is not plaintiff's spouse or family member, she must prove all the elements of a gift by clear and convincing evidence, including donative intent. See Bowman v. Pettersen, 410 Ill. 519, 532, 102 N.E.2d 787, 794 (1951); Hall v. Eaton, 258 Ill. App. 3d 893, 895, 631 N.E.2d 833, 836 (1994); In re Estate of Poliquin, 247 Ill. App. 3d 112, 116, 617 N.E.2d 40, 43 (1993); 20 Ill. L. & Prac. Gifts §46, at 333-34 (Supp. 2009).

       If someone writes a friend a check, the law presumes the check is not a gift but the payment of an antecedent debt. Faletti v. Child, 204 Ill. App. 158, 159 (1917) (abstract); In re Estate of Platner, 138 A.D.2d 490, 492, 525 N.Y.S.2d 887, 889 (1988); Stanley v. Estate of Walters, 147 Ind. App. 456, 460, 261 N.E.2d 594, 597 (1970); Williams v. Frazer, 6 Tenn. App. 211, 218 (1927); 60 Am. Jur. 2d Payment §107, at 786 (2003); 38A

C.J.S. Gifts §70, at 265 (2008). On the record before us, no one could reasonably dispute that plaintiff delivered to defendant a total of $27,000 in cashier's checks. It is not that plaintiff allegedly handed defendant 270 hundred-dollar bills and now all we have is plaintiff's word that he did so. Rather, two cashier's checks are in evidence, one for $25,000 and the other for $2,000, and in her answer, defendant admits receiving those checks from plaintiff. Further, her signature of endorsement is on the back of the checks. This delivery of $27,000 is real and documented; traceable money changed hands. As we have explained, because defendant is neither the spouse nor a family member of plaintiff, the law presumes he paid her this $27,000 not as a gift but in satisfaction of an antecedent debt.

The presumption of an antecedent debt, however, has been rebutted. Merely by taking the position that the $27,000 was a gift, defendant negates the possibility that plaintiff owed her $27,000. If plaintiff owed her $27,000, defendant could not logically assert that his payment to her of $27,000 was gratuitous.

Clearly, $27,000 changed hands, and if not the payment of a debt, the $27,000 had to be <u>something</u>. The presumption next in line, after payment of an antecedent debt, is the making of a loan. <u>Mantiply v. Mantiply</u>, 951 So. 2d 638, 649 (Ala. 2006); <u>Grose v. Bow Lanes, Inc.</u>, 661 N.E.2d 1220, 1224 (Ind. App. 1996); <u>Platner</u>, 138 A.D.2d at 492, 525 N.Y.S.2d at 889; <u>Williams</u>, 6 Tenn. App. at 218; 60 Am. Jur. 2d <u>Payment</u> §107, at 786 (2003). This alternative presumption makes sense because the initial presumption--payment of an antecedent debt--was of a commercial transaction, a non-gratuitous transfer. When a person writes a check to a payee who is neither the spouse nor

a relative of that person, rather than presume that the check was a gift--which must be proved by clear and convincing evidence--the law will presume that the parties engaged in a contractual transaction: the law will presume that the check was in payment of a debt, or, if that presumption is rebutted, the law will presume the check was a loan.

Of course, presumptions can be rebutted, and the payee's identity as a charitable organization, for instance, would rebut the presumption of a loan. But defendant in this case is not a charitable organization, and she has not presented any evidence rebutting the presumption that plaintiff delivered the checks to her as a loan. Regardless of whether the trial court found plaintiff to be a credible witness, the burden of going forward with evidence shifted to defendant because the undisputed documentary evidence in plaintiff's case created the presumption of a loan. See Franciscan Sisters Health Care Corp. v. Dean, 95 Ill. 2d 452, 462, 448 N.E.2d 872, 876 (1983). The burden of production shifted to defendant because it was undisputed that (1) plaintiff delivered to her two cashier's checks totaling $27,000 and (2) plaintiff was not indebted to her in the amount of $27,000. Because those two propositions were undisputed, the law presumed that the $27,000 was a loan, not a gift. The court did not have to take plaintiff's word for it that the $27,000 was a loan; the law raised that presumption. Consequently, at the close of plaintiff's case, the burden shifted to defendant to come forward with evidence opposing the presumption of a loan (see Franciscan Sisters, 95 Ill. 2d at 462, 448 N.E.2d at 876), and because defendant claimed the $27,000 was a gift, that evidence had to be clear and convincing (see Bowman, 410 Ill. at 532, 102 N.E.2d at 794; Hall, 258 Ill. App. 3d at 895, 631 N.E.2d at 836). Instead of requiring defendant to meet her burden of production, the

court granted her motion for judgment at the close of plaintiff's case. Since the presumption of a loan is, at this point, unrebutted, the judgment is against the manifest weight of the evidence.

## D. The Statute of Frauds

Defendant argues that although the trial court did not cite the statute of frauds (740 ILCS 80/1 (West 2002)) as a reason for granting her motion for judgment at the close of plaintiff's case, we may affirm the judgment for any reason supported by the record (Casey National Bank v. Roan, 282 Ill. App. 3d 55, 63, 668 N.E.2d 608, 614 (1996)), and one of the reasons why the judgment is correct is that the statute of frauds bars plaintiff's action. The statute of frauds "prohibits oral contracts that cannot be performed within one year of their making." Robinson v. BDO Seidman, LLP, 367 Ill. App. 3d 366, 370, 854 N.E.2d 767, 772 (2006). According to defendant, plaintiff's own testimony established that the alleged oral contract in this case was not capable of being performed within one year.

We disagree. The alleged contract required defendant to repay plaintiff, and, strictly from the standpoint of possibility, she could have repaid him immediately. After he endorsed the cashier's checks as payable to her order and delivered them to her, she could have paid him back instantly by endorsing the cashier's checks as payable to his order and handing them back to him. Therefore, it was theoretically possible for her to perform the alleged contract within a year. "[I]f the contract is one of indefinite duration[] but performance within a year is possible by its terms, the contract is not within the statute, no matter how unlikely it is that it will actually be performed within a year." E. Farnsworth,

Contracts §6.4, at 132 (3d ed. 2004). The test is whether the contract was capable of being performed within one year after its formation, not whether the parties contemplated that it would be performed within that time. <u>Robinson</u>, 367 Ill. App. 3d at 370, 854 N.E.2d at 772.

### III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and remand this case with directions to resume the trial and proceed to its conclusion.

Reversed and remanded.

STEIGMANN and POPE, JJ., concur.