# Illinois Official Reports

## Appellate Court

---

***Church Yard Commons Ltd. Partnership v. Podmajersky, Inc.*,**
**2017 IL App (1st) 161152**

---

| | |
|---|---|
| Appellate Court Caption | CHURCH YARD COMMONS LIMITED PARTNERSHIP; DEVELOPING ENVIRONMENTS LIMITED PARTNERSHIP; ELIZABETH PARK LIMITED PARTNERSHIP; GALLERY SQUARE LIMITED PARTNERSHIP; PILSEN EAST MALL LIMITED PARTNERSHIP; SODA POP LOFTS LIMITED PARTNERSHIP; VICTORIA GARDENS LIMITED PARTNERSHIP; CHURCH YARD COMMONS, INC.; DEVELOPING ENVIRONMENTS, INC.; ELIZABETH PARK, INC.; GALLERY SQUARE, INC.; PILSEN EAST MALL, INC.; SODA POP LOFTS, INC.; VICTORIA GARDENS, INC.; THE ESTATE OF JOHN PODMAJERSKY, JR.; THE ESTATE OF ANNELIES PODMAJERSKY; THE JOHN PODMAJERSKY, JR., REVOCABLE TRUST; and THE ANNELIES PODMAJERSKY REVOCABLE TRUST, Plaintiffs, v. PODMAJERSKY, INC., and JOHN PODMAJERSKY III, Defendants (John Podmajersky III and Podmajersky, Inc., Counterplaintiffs-Appellants; Lisa Podmajersky, Individually, as Trustee of the Annelies Podmajersky Trust, as Executor of the Estate of Annelies Podmajersky, as Trustee of the John Podmajersky, Jr., Trust, and as Executor of the Estate of John Podmajersky, Jr.; Church Yard Commons Limited Partnership; Developing Environments Limited Partnership; Elizabeth Park Limited Partnership; Gallery Square Limited Partnership; Pilsen East Mall Limited Partnership; Soda Pop Lofts Limited Partnership; Victoria Gardens Limited Partnership; Church Yard Commons, Inc.; Developing Environments, Inc.; Elizabeth Park, Inc.; Gallery Square, Inc.; Pilsen East Mall, Inc.; Soda Pop Lofts, Inc.; and Victoria Gardens, Inc.; Counterdefendants-Appellees). |
| District & No. | First District, Second Division<br>Docket No. 1-16-1152 |
| Filed | March 28, 2017 |

| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 12-CH-28111, 14-L-5947; the Hon. Rita M. Novak, Judge, presiding. |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Roth Fioretti, LLC, of Chicago (Mark D. Roth, of counsel), for appellants. |
| | Perkins Coie LLP (Eric D. Brandfonbrener and Kathleen A. Stetsko, of counsel), and Richard J. Prendergast, Ltd. (Richard J. Prendergast and Dierdre A. Close, of counsel), both of Chicago, for appellees. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Hyman and Justice Neville concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiffs John Podmajersky, Jr. (John Jr.), and Annelies Podmajersky owned real estate in the East Pilsen neighborhood of Chicago, Illinois. Pursuant to an alleged 2003 oral agreement, their son, defendant John Podmajersky III (John III), managed the properties for them. In exchange, John Jr. and Annelies agreed to make John III an equal partner in their East Pilsen real estate business. This appeal concerns the enforceability of that oral agreement.

¶ 2    In 2012, John Jr. and Annelies brought suit against John III, alleging that John III breached his fiduciary duties by failing to provide them with financial information about the properties. John Jr. and Annelies sought various remedies, including an injunction to compel John III to relinquish control of the properties. During the pendency of the lawsuit, John Jr. and Annelies died, and their daughter, Lisa Podmajersky, was substituted as a party in her capacity as executor of their estates.

¶ 3    After his parents' death, John III filed a counterclaim against Lisa, which is the subject of the instant appeal. The central allegation of the counterclaim is that Lisa exerted undue influence over her parents to poison their relationship with John III and manipulate them into terminating the 2003 agreement. John III sought relief in 28 counts, including 7 counts seeking declarations enforcing the 2003 agreement and 7 counts seeking relief for his parents' breach of the 2003 agreement.

¶ 4    Lisa filed a motion to dismiss the counterclaim, which the trial court granted in part based on its finding that the 2003 agreement was unenforceable under section 1 of the Frauds Act as an oral contract "that is not to be performed within the space of one year from the making

thereof" (740 ILCS 80/1 (West 2014)). Accordingly, the trial court dismissed the 14 counts described above. John III's counts alleging tortious interference with a business relationship, a business expectancy, and an inheritance expectancy remain pending in the trial court. At John III's request, the court also made a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no just reason to delay appeal the dismissal of those counts. John III appeals, contending that the trial court erred in finding that the Frauds Act bars enforcement of the 2003 agreement. We agree with the trial court that the oral agreement, which required "the commitment of a lifetime of work" from John III, was not to be performed within the space of a year and was for that reason unenforceable. We therefore affirm.

¶ 5                                      BACKGROUND

¶ 6        John III filed his second amended consolidated verified counterclaim on April 20, 2015, naming Lisa as a defendant individually, in her capacity as executor of their parents' estates, and in her capacity as the successor trustee of their parents' revocable trusts. John III also named as defendants each of the seven limited partnerships that John Jr. and Annelies established to own most of their real estate, as well as each of the seven corporate general partners of each partnership.

¶ 7        According to the verified counterclaim, which we take as true for purposes of this appeal, John Jr. and Annelies developed a substantial real estate business in the East Pilsen neighborhood of Chicago. John III was involved in the family business from childhood and throughout his entire adult life. By contrast, Lisa lived outside of Illinois from the early 1980s until early 2012 and had little involvement with the business. John Jr. and Annelies expected John III to continue the family legacy in East Pilsen and repeatedly told him that someday the family holdings would all belong to him.

¶ 8        In 2003, John Jr. and Annelies, who were then 81 and 75 years old, respectively, determined that they were unable to continue actively managing their properties. At their request, John III agreed to take over all aspects of the management and operation of the East Pilsen properties.

¶ 9        Also in 2003, the parties reached the oral agreement that is the subject of this appeal. John Jr. and Annelies agreed to make John III an equal partner in each of the limited partnerships and an equal owner of each of the corporate general partners. In exchange, John III agreed to remain involved in the day-to-day operation and management of the family's East Pilsen properties and to refrain from pursuing other career opportunities. Regarding this agreement, the counterclaim alleged:

         "In accepting John and Annelies' offer to become a partner, John III expressed and made clear to his parents (John and Annelies) that *what they were asking would require the commitment of a lifetime of work* and he would need to forego opportunities outside the neighborhood. John and Annelies indicated they understood." (Emphasis added.)

¶ 10       The parties also agreed that the partnership agreements for each of the limited partnerships would be modified to include the following terms: (i) John III would forfeit his interests in the limited partnerships and the corporate general partners if he dissociated himself from the East Pilsen neighborhood; (ii) John Jr. and Annelies would receive monthly distributions from the limited partnerships; (iii) John III would receive distributions in the form of compensation to his company Podmajersky, Inc., as well as compensation for leasing, marketing, out-of-pocket, vendor, and construction costs; (iv) purchase or disposal of assets would require the

- 3 -

unanimous consent of all three partners; (v) if the partners decided to sell any assets, John III would have the right to purchase his parents' share at its current fair market value and vice versa; and (vi) upon the deaths of John Jr. and Annelies, John III would have the right to purchase their interests in the limited partnerships and corporate general partners at a price "determined by the then current business value with a discount for family and bulk purchase."

¶ 11    John III kept his end of the bargain. He established and cultivated the Chicago Arts District in the East Pilsen neighborhood and made improvements to Podmajersky, Inc., to enable it to meet the needs of the limited partnerships. He provided regular statements to his parents indicating that Podmajersky, Inc., was receiving management fees up to 19.25% of collected revenues; his parents were aware of, and agreed to, these fees. In reliance on the 2003 agreement, John III refrained from expanding his commercial real estate holdings outside of the East Pilsen neighborhood.

¶ 12    Sometime in late 2003 or early 2004, John Jr. and Annelies asked their longtime estate planning attorney, Mark Neil, for advice about implementation of the 2003 agreement. Neil developed a "conceptual plan" whereby John Jr. and Annelies's interests in their East Pilsen properties would be transferred to John III through a part-sale and part-gift transaction, while Lisa would receive a cash inheritance. John Jr., Annelies, and John III also discussed the implementation of the conceptual plan with the family accountant, Bruce Robbins. But over the next decade and prior to the deaths of Annelies and John Jr. in 2013 and 2014, respectively, the conceptual plan was never implemented or reduced to writing.

¶ 13    John III alleged that Lisa began to reinsert herself into her parents' lives after she learned that the conceptual plan did not grant her any interest in the family business. In doing so, she took advantage of her parents' physical and mental decline. John Jr. began suffering from dementia in 2009, and by 2012 he was "increasingly confused." He was also wheelchair-bound and was diagnosed with cancer in 2012. As for Annelies, she had been undergoing treatment for cancer since 2006 and was hospitalized in late 2011.

¶ 14    After Annelies's hospitalization, Lisa moved to Chicago to live with her parents. Lisa changed the locks to her parents' condominium so that John III could not enter. She also deliberately isolated her parents from John III and fabricated stories to poison their relationship with him; in particular, Lisa repeatedly told them that John III was stealing money from them and could not be trusted. As a result of Lisa's efforts to alienate her parents from John III, John Jr. and Annelies sought to terminate their agreement with John III and Podmajersky, Inc., regarding the management of their properties. In 2012, at Lisa's direction, John Jr. and Annelies filed the instant lawsuit against John III and Podmajersky, Inc., alleging breach of fiduciary duty.

¶ 15    On July 3, 2013, when John Jr. and Annelies were weak, in declining mental and physical health, and, according to the counterclaim, "completely under Lisa's control," they executed new wills. They also executed restatements of the John Podmajersky, Jr., Revocable Trust and the Annelies Podmajersky Revocable Trust. All of these documents were drafted by an attorney procured by Lisa and written under Lisa's direction. The restatements effectively gave control of the limited partnerships to Lisa despite her lack of experience in the real estate business.

¶ 16    Annelies died on September 28, 2013. On July 29, 2014, John Jr. executed a new will and an amendment to his trust; again, both were drafted under Lisa's direction. These documents exercised a power of appointment over the Annelies Podmajersky Revocable Trust and the

Annelies Podmajersky 2012 Special Trust, directing all of the trust assets to be distributed to a trust for the benefit of Lisa. John Jr.'s 2013 restatement and his 2014 will and amendment effectively eliminated all of John III's inheritance from his parents. On October 31, 2014, a few months after these documents were executed, John Jr. died.

¶ 17    Of the 28 counts included in John III's counterclaim, 14 are relevant to this appeal. These can be divided into two main groups. In the first group (counts I, IV, VII, X, XIII, XVI, and XIX), John III seeks declarations enforcing the 2003 oral agreement. Each count concerns one of the seven limited partnerships that are defendants in this suit. For each partnership, John III alleges that he is a limited partner with a 50% ownership interest, that his partnership interest shall be forfeited if he dissociates himself from the East Pilsen neighborhood, and that Podmajersky, Inc., is responsible for providing management services for the partnership's real estate.

¶ 18    In the second group of counts (counts II, V, VIII, XI, XIV, XVII, and XX), asserted on behalf of both John III and Podmajersky, Inc., John III seeks damages for breach of the 2003 agreement. These counts are alleged in the alternative to the first group of counts. As before, each count concerns one of the seven limited partnerships.

¶ 19    In the remaining counts, which are not at issue in this appeal, John III alleges that (i) Lisa tortiously interfered with his business relationship with each of the seven limited partnerships, (ii) he and his parents had an oral agreement relating to property his parents owned at 920 Cullerton Street in Chicago, (iii) his parents sold property located at 719 West 19th Street without his consent in breach of the 2003 agreement, and (iv) Lisa is guilty of tortious interference with both John III's inheritance and business expectancy. As to this last category of claims, John III alleges that upon his parents' death, he expected to receive half of the assets in his parents' trusts and half of their personal assets or, "in the alternative," he expected to receive all of the interests in the limited partnerships, as per the conceptual plan. He further alleges that Lisa interfered with that expectancy by exerting undue influence over their parents and controlling their estate plan.

¶ 20    Lisa filed a combined section 2-615 and section 2-619 motion to dismiss the counterclaim. 735 ILCS 5/2-615, 2-619, 2-619.1 (West 2014). In seeking section 2-619 dismissal, Lisa argued, in relevant part, that the 2003 oral agreement was unenforceable under section 1 of the Frauds Act, which provides: "No action shall be brought *** upon any agreement that is not to be performed within the space of one year from the making thereof" unless the agreement is in writing. 740 ILCS 80/1 (West 2014). She also argued that the agreement was unenforceable under section 2, which requires contracts for the sale of land to be in writing. 740 ILCS 80/2 (West 2014).

¶ 21    On February 17, 2016, the trial court issued an order granting in part and denying in part Lisa's motion to dismiss. The court rejected Lisa's argument under section 2 of the Frauds Act, finding that the 2003 agreement was not a contract for the sale of land but a transfer of partnership interests, which are considered personal property under Illinois law. But the court agreed with Lisa that section 1 of the Frauds Act rendered the 2003 agreement unenforceable. The court reasoned that the 2003 agreement was similar in character to a lifetime employment agreement; John III, by his own admission, made the "commitment of a lifetime of work" in the East Pilsen area and agreed to forgo other business opportunities. Because the parties anticipated a relationship of long duration, the Frauds Act was applicable.

¶ 22 Accordingly, the court dismissed the seven counts seeking declarations enforcing the 2003 agreement against each of the partnerships and the seven breach of contract counts premised upon the 2003 agreement.[1]

¶ 23                                                              ANALYSIS

¶ 24 The claims at issue in this appeal were dismissed under section 2-619(a)(7) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(7) (West 2014)), which permits involuntary dismissal of claims that are unenforceable under the Frauds Act. In ruling upon a section 2-619 motion, the court must interpret all pleadings in the light most favorable to the nonmoving party. *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352 (2008). Our review of the dismissal of John III's claims is *de novo*. *Id.*

¶ 25 John III argues that the trial court erred in finding that the 2003 agreement was unenforceable under section 1 of the Frauds Act. He argues that the 2003 agreement was not a lifetime employment contract and was capable of being performed within a year. Alternatively, he argues that his partial performance of the 2003 agreement bars application of the Frauds Act. Lisa urges us to affirm the trial court either under section 1 of the Frauds Act or, alternatively, because the 2003 agreement was a contract for the sale of land and thus unenforceable under section 2 of the Frauds Act.

¶ 26 Section 1 of the Frauds Act provides, in pertinent part:

> "No action shall be brought *** upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith ***." 740 ILCS 80/1 (West 2014).

This statute operates as an evidentiary safeguard. It serves to shield both defendants and the courts from the problems of proof accompanying oral contracts, in recognition of the fact that "with the passage of time evidence becomes stale and memories fade." *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 489 (1997).

¶ 27 The traditional interpretation of this and similar statutes in other jurisdictions, as set forth in the Restatement (Second) of Contracts, is that they only apply to contracts that are not capable of being performed within a year. Restatement (Second) of Contracts § 130 (1981); see *Armagan v. Pesha*, 2014 IL App (1st) 121840, ¶ 41. That is, if an oral agreement could potentially be performed within a year, regardless of the parties' expectations or the actual course of events, then the Frauds Act will not bar its enforcement. See *Barnes v. Michalski*, 399 Ill. App. 3d 254, 271 (2010) (loan agreement was enforceable even though plaintiff did not expect to be paid back within a year, since defendant could in theory have repaid the loan immediately). Under this approach, all contracts of uncertain duration are exempted from compliance with the statute. Restatement (Second) of Contracts § 130 cmt. a (1981).

¶ 28 Our supreme court has departed from this approach by carving out an exception for lifetime employment contracts in *McInerney*, 176 Ill. 2d 482. The *McInerney* plaintiff brought

---

[1]The trial court also dismissed the counts alleging that John III's parents breached an oral agreement regarding the Cullerton property and that his parents breached the 2003 agreement by selling property without his consent, but the trial court made no Rule 304(a) findings as to these counts, so they are not at issue in this appeal.

- 6 -

a breach of contract suit against his former employer, alleging that the employer verbally agreed to employ him " 'for the remainder of his life.' " *Id.* at 484. The court acknowledged that this contract could potentially be performed within a year, since the plaintiff could die within a year. But the court stated that denying the application of the Frauds Act for this reason would be "hollow and unpersuasive":

> "A 'lifetime' employment contract is, in essence, a permanent employment contract. Inherently, it anticipates a relationship of long duration—certainly longer than one year. In the context of an employment-for-life contract, we believe that the better view is to treat the contract as one 'not to be performed within the space of one year from the making thereof.' To hold otherwise would eviscerate the policy underlying the statute of frauds and would invite confusion, uncertainty and outright fraud. Accordingly, we hold that a writing is required for the fair enforcement of lifetime employment." *Id.* at 490-91.

Therefore, notwithstanding the fact that the duration of the contract was uncertain and performance was technically possible within a year, the *McInerney* court found the oral contract to be unenforceable. *Id.* at 493; see also *Robinson v. BDO Seidman, LLP*, 367 Ill. App. 3d 366, 371 (2006) (under *McInerney*, oral contract for employment " 'as long as plaintiff desired' " was not enforceable).

¶ 29    The trial court found that, under *McInerney*, the Frauds Act bars enforcement of the 2003 agreement. The court reasoned that the lifetime employment contract in *McInerney* was analogous to the 2003 agreement because John III made "the commitment of a lifetime of work." John III argues that this finding was in error. In particular, he argues that his statement about a "lifetime of work" was not a term of the agreement but merely an expression of the potential magnitude of the undertaking. According to John III's interpretation of the contract, the duration of his work in the East Pilsen neighborhood was unspecified and could well have ended within a year. In this vein, John III points out that not all contracts of indefinite duration fall within the Frauds Act. See *Czapla v. Commerz Futures, LLC*, 114 F. Supp. 2d 715, 719 (N.D. Ill. 2000) ("*McInerney* did not speak to all contracts of indefinite duration, and it did not hold that all employment contracts without specific duration are lifetime contracts.").

¶ 30    We agree with the trial court. As set forth in the counterclaim, the 2003 agreement did more than just suggest the possibility of a lifetime of work; it explicitly "require[d] the commitment" of a lifetime of work. Based upon this requirement, it is clear that the agreement, by its terms, inherently anticipated a relationship of long duration. John III's performance would not conclude whenever he felt like it, or when he found more lucrative business opportunities elsewhere, or even when his parents died. His parents could have fully performed their part of the contract upon their deaths by transferring their interests in the limited partnerships to him, but John III would remain contractually obligated to carry on the family business in the East Pilsen neighborhood for life. This is, according to the allegations of John III's counterclaim, both what his parents expected of him and what he agreed to do. Thus, under *McInerney* and *Robinson*, the 2003 oral agreement is unenforceable. See also *Clampitt v. American University*, 957 A.2d 23, 35 (D.C. 2008) (oral employment contract was unenforceable under statute of frauds where it "obviously contemplat[ed] long-term employment" and "any decision [the employee] might have made to retire early, within a year of being hired, would have defeated rather than completed the terms of the oral contract" (internal quotation marks omitted)).

¶ 31    John III nevertheless argues that *McInerney* and *Robinson* are inapposite because those cases dealt with simple employment contracts, while the 2003 agreement involves the transfer of partnership interests to John III. This is a distinction without a difference. Even though the context is different, the reasoning of *McInerney* still applies; the duration of the contract was intended as John III's lifetime, and as such, the contract "[i]nherently *** anticipates a relationship of long duration" (*McInerney*, 176 Ill. 2d at 490). Indeed, if anything, the fact that the oral contract also involved the transfer of interests in partnerships that owned interests in real property, in addition to the commitment of lifetime employment, weighs in favor of enforcing the Frauds Act writing requirement.

¶ 32    John III also argues that the present case is analogous to *Martin v. Federal Life Insurance Co.*, 109 Ill. App. 3d 596, 604 (1982), where an employer promised to employ the plaintiff until the plaintiff retired from business pursuits or voluntarily left the company. The *Martin* court held that this agreement was not barred by the statute of frauds, because plaintiff could well have chosen to retire or leave within a year. In reaching this conclusion, the court stated: "In general, lifetime employment contracts have not been held barred by the Statute of Frauds." *Id.* But this proposition was rejected by our supreme court 15 years later in *McInerney*. *McInerney*, 176 Ill. 2d at 490. To the extent that *Martin* conflicts with *McInerney*, it is no longer good law. Moreover, the facts of *Martin* are not analogous because the *Martin* plaintiff was apparently free to leave the company at will—conduct that would not breach the alleged contract—whereas John III agreed to continue managing his family's East Pilsen properties for life.

¶ 33    Finally, John III argues that, even if the 2003 agreement was not to be performed within a year, his partial performance of the contract precludes the application of the Frauds Act. This argument was not raised in the circuit court and, therefore, will not be considered on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); see *Mabry v. Boler*, 2012 IL App (1st) 111464, ¶ 24 ("arguments not raised before the circuit court are forfeited and cannot be raised for the first time on appeal"). This is particularly true where the new argument is urged as a basis for reversal of the order appealed from.

¶ 34    In any event, our supreme court rejected a nearly identical argument in *McInerney*, where the plaintiff argued that his partial performance of his lifetime employment contract should preclude the application of the Frauds Act. *McInerney*, 176 Ill. 2d at 491. The *McInerney* court explained that partial performance does not bar application of the Frauds Act unless it would otherwise be "impossible or impractical to place the parties in status quo or restore or compensate the performing party for the value of his performance." (Internal quotation marks omitted.) *Id.* Because plaintiff was fully compensated for the work that he performed, his performance did not take the contract out of the Frauds Act. *Id.* Likewise, John III was compensated for his work: his company, Podmajersky, Inc., received management fees up to 19.25% of the collected revenues from his parents' East Pilsen properties. Accordingly, even if this argument was not forfeited, John III's partial performance would not warrant enforcement of the 2003 oral agreement.

¶ 35    Given our finding that the court properly dismissed John III's claims based on the 2003 agreement under section 1 of the Frauds Act, we need not reach Lisa's alternative ground for affirmance.

## CONCLUSION

Because the 2003 agreement required that John III commit to a lifetime of work in the East Pilsen neighborhood, it was not an agreement to be performed within one year, and its enforcement is barred by the Frauds Act. We affirm the trial court's dismissal of the counts of the counterclaim premised upon the 2003 agreement.

Affirmed.